UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AGRICOLA CUYUMA SA, CORPORACION AGRICOLA VINASOL SAC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 0:17-cv-00000-XXX |
| v. | ) ) | JURY TRIAL DEMANDED |
| CORONA SEEDS, INC. | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR DAMAGES

COME NOW Plaintiffs and file this Complaint for Damages against Defendant and state the following:

1.      This is an action to seek recovery for damages caused by the actions of Defendant who knowingly or with reckless disregard for the truth shipped Plaintiffs certain seeds, in such deteriorated condition that they caused substantial damages to Plaintiffs' lands, crops, and clients, virtually destroying their entire businesses. Defendant, a sophisticated California seed grower with over 23 years of experience, knowing the condition of the seeds, could have reasonably foreseen and prevented the damages to Plaintiffs. Instead, Defendant ignored the risks of selling poor quality seeds just to make a quick profit from two small Peruvian companies that he thought would never seek redress for the injustice he would cause.

## THE PARTIES

2.      Plaintiff Agricola Cuyuma SA ("Cuyuma") is a Peruvian company with its main offices located at Luis Arias Schreiber 225, Suite 303, Miraflores-Lima, Peru. Cuyuma is in the agriculture industry. Cuyuma produces, among other crops, asparagus, snow peas, sugar snap peas, grapes, mangos, and avocados.

3.      Plaintiff Corporacion Agricola Vinasol SAC ("AVSA") is also a Peruvian company with its main offices located at Jr. Juan Acevedo 364, Pueblo Libre, Lima-Peru. AVSA is also in the agriculture industry. AVSA produces, among other crops, asparagus, citric, snow peas, and avocados.

4.      Corona Seeds Inc., ("Corona") is a domestic stock Corporation registered in California since June 27, 1994. Corona's address as listed in the California Department of State Website is 590 F. Constitution Avenue, Camarillo, California 93012. Corona is also in the agriculture business. Corona is a leading provider of organic vegetable and herb seeds.

5.      Mike Newman ("Newman") is the Owner of Corona. Newman is a resident of the State of California, and was directly involved in the transaction that caused Plaintiffs' damages.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and the dispute is between a citizen of California and a citizen of Peru, a foreign state.

7.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. Section 1331, as Counts VI and XIII of this Complaint arise under the Federal Seed Act. This Court also has supplemental jurisdiction under 28 U.S.C. Section 1367 over the California State law claims, as they are substantially related to Counts VI and XIII arising under federal law.

8.      This Court has personal jurisdiction over the Defendant because the Defendant is a resident of Camarillo, California, conducts business in Camarillo, California, committed torts in Camarillo, California, breached agreements in Camarillo, California, and violated state and federal law in Camarillo, California.

9.      Venue is proper in the Central District of California pursuant to 28 U.S.C. Section 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Camarillo, California.

10.     All conditions precedent to filing of this action were completed or are not required because of either the diversity jurisdiction or because the seeds were planted outside of California.[1]

## GENERAL ALLEGATIONS

### 1.  The Export of Contaminated Low-Germinating Seeds to AVSA

*The inception of the transaction and the realization of the extremely poor quality of the seeds.*

11.     On or about January 2016, AVSA obtained several lucrative contracts for the sale of Sapphire Peas and other kinds of peas, which in total would require AVSA to produce approximately 260,000 boxes of plants (the "2016 Campaign"). AVSA communicated with Corona and told Newman about its contracts in Europe and the need to purchase the Sapphire Seeds variety ("Sapphire Seeds" or "Seeds" or "Sapphires" or "Lot C242606") so AVSA could fulfill its contractual obligations.

---

[1] California Code of Regulations states that "meditation [sic] procedures . . . [are] a prerequisite to pursuing other dispute resolution mechanisms against a seed labeler *when seed planted in California* fails to conform to the label statements required by Sections 52452 and 52453 of the Food and Agricultural Code. Cal. Code Regs., tit. 3, § 3915 (Lexis Advance through Register 2017, No. 40, October 6, 2017) (emphasis added).

12.    On or about January 2016 AVSA sent a purchase order to Corona and Corona sent AVSA a purchase contract for 115 50-pound bags of Sapphire Seeds and two 50-pound bags of Sugar Bro seeds. The purchase contract is attached to this Complaint as **Exhibit A**. AVSA paid $26,400 via wire transfer for the Seeds.

13.    The purchase contract from Corona represented 74% of the total seeds for the 2016 Campaign. Corona knew that its seeds comprised the majority of the seeds in AVSA's 2016 Campaign.

14.    On or about April 2016 Corona delivered the Seeds to AVSA. The bags' label stated that the seeds had an 87% germination rate. See label and corresponding transcription attached as **Exhibit B**.

15.    On May 10, 2016, AVSA began sowing the Sapphire Seeds. It planted and raised the Seeds according to industry standards regarding temperature, irrigation and nutrition for Seeds of this type.

16.    On May 19, 2016, AVSA Engineer Fernando Solis[2] ("Solis") informed AVSA Agricultural Production Chief Edwin Maldonado ("Maldonado") about the serious defects found during the germination of the Seeds. Solis's assessment was based on an evaluation of the first 6.5 hectares where the Seeds had been planted.

17.    The same day, Solis and Maldonado informed Leonel Cruz ("Cruz"), a Corona representative in charge of technical matters, about the serious problems with the Seeds.

18.    In an effort to understand the cause of the poor germination, on or about the same day, AVSA's engineers conducted germination tests in the field and in trays. AVSA performed the tests using seeds without disinfectants. On May 23, 2016, the results of the tests showed that

---

[2] Solis is the Chief Plant Health Officer for AVSA in Pisco, the region where the Seeds were planted.

the seeds in the field and in the trays had a germination rate lower than 50%—a drastic contrast to the 87% Corona displayed on its own packaging label.

***Corroboration of results through third party analysis including Corona's own testing***

19.     On May 24, 2016, AVSA's board of directors decided to obtain further analysis of the Seeds from authorized laboratories in Peru for this type of testing. AVSA ordered germination and vigor testing from (1) National Agrarian University ("UNALM")[3] (2) the National Institute of Agricultural Research and Innovation ("INIA")[4] and (3) Peru's National Agricultural Safety Service ("SENASA").[5] Later on, AVSA sent the seeds for additional testing at (4) SGS[6] laboratories in South Dakota ("SGS") and (5) SGS Lisbon, Portugal were obtained.

20.     On May 25, 2016, Corona's Cruz was informed that there were only seven plants per linear meter and the presence of weak coriaceous leaves. In an effort to salvage the Sapphire plants, the same day, Mr. German Sotillo ("Sotillo"), AVSA's operations manager, emailed Newman, requesting that Corona change or replace the Seeds. In the same email to Newman, Sotillo also informed Corona of the serious problems that the poor-quality Seeds were causing, and the further damage it was going to cause to AVSA with regards to fulfilling its contracts. Sotillo told Newman that the entire 2016 Campaign was in jeopardy.

21.     From May 30, 2016 to June 5, 2016, AVSA stopped sowing. It was clear that the Seeds were not viable and were putting the entire 2016 Campaign in jeopardy, as well as putting AVSA at risk of being unable to fulfill its contracts with end customers. The next day, on May

---

[3] UNALM stands for Universidad Nacional Agraria La Molina or National Agrarian University of La Molina. UNAML is the most prestigious Agrarian University in Peru, and one of the best in South America.
[4] INIA or Instituto Nacional de Innovacion Agraria is a public entity part of the Peruvian Department of Agriculture in charge of agrarian innovation, research, and strategy.
[5] SENASA or Servicio Nacional de Sanidad y Calidad Agroalimentaria is also part of the Department of Agriculture and is in charge of quality control, organic production and, plant health.
[6] SGS is a laboratory member of the International Seed Testing Association ("ISTA").

31, 2016, AVSA sent samples of the Seeds for germination analysis to the UNALM and INIA laboratories.

22.     On September 8, 2016, Newman sent an email to AVSA's Oscar Alban ("Alban"), admitting that Lot C242606 of the Sapphire Seeds was defective. Newman stated that Corona was "about to confirm" that the germination rate of the Seeds, according to its own tests, was 62%. However, records from communications with Cuyuma show that the germination rate had already been confirmed. As early as June 9, 2017, Newman had already told Cuyuma that three separate lab tests confirmed that the Seeds' germination rate was 62%. In other words, Newman was not "about to confirm" this fact; he already had.

23.     Not only was Newman misrepresenting to AVSA a fact it already knew, but also, it was virtually impossible that healthy seeds that Corona guaranteed had an 87% germination rate only four months prior, now had a 62% germination rate.[7]

24.     UNALM and INIA concluded that the Seeds were of poor quality and that at best they had a germination rate of 49%. UNALM also found that the Seeds had an electrical conductivity (EC) of 40-uS/cm/g and that seeds like these "should not be considered a seed."[8] The report also stated a well-known fact in the agriculture industry: that the 40-uS/cm/g conductivity level shown is one of the worst that could exist. See UNALM report attached as **Exhibit C**.

---

[7] Experts in the industry confirm that it is virtually impossible for a germination test of healthy seeds to show a rate of 87% when the seeds tested in fact have a germination rate of 62% or lower. Either Corona intentionally misrepresented what it knew, or it did not do any test at all and shipped the Seeds with a made-up germination number. After learning of this Newman issued a credit to AVSA for an additional 115 bags of Sapphire as a replacement. This, however, was too late. By the time the replacement seeds could be used the entire 2016 Campaign was at risk from the delays alone, not to mention the contamination of other crops, discussed *infra*.
[8] It is well known in the seed industry that a seed with a germination rate higher than 85% (or 87% like Corona's) should have an EC lower than 24 uS/cm/g as opposed to 40.

25.     To further corroborate what was already a known fact regarding the condition of the Seeds, AVSA ordered analysis from International Seed Testing member SGS laboratories. Like UNALM and INIA, SGS also concluded that only 44% of the Seeds were normal plants. Additionally, SGS found the presence of the following gram-negative bacteria: Pantoea SP, Enterobacteriaceae, Erwinia SP, and Acinetobacter SP. See SGS reports attached as **Exhibit D**.

***The grossly misrepresented germination, campaign delays, and cross-contamination***

26.     Efforts to find a viable replacement seed in the area were unsuccessful. Peru does not have Sapphire seeds. Thus, on Newman's advice, on June 8, 2016, AVSA starting re-sowing Corona's Sapphires with a 3-to-1 ratio.[9] Newman issued a credit to AVSA for an additional 115 bags of Sapphires as a replacement.

27.     By then the 2016 Campaign was already substantially delayed. Under the sowing schedule, AVSA should have had 21 hectares planted by mid-June 2016. Instead, it had only planted 1.75 hectares. See Comparative Table below showing the delays:

COMPARATIVE TABLE OF THE PROJECTED Vs THE EXECUTED SWEET PEA AVSA 2016 PROGRAM

| | TYPE / WEEK | APRIL | MAY | | | | JUNE | | | | | JULY | | | | AUGUST | | TOTAL (Ha) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | |
| PROJECTED (Ha) | SWEET | 7 | 6,15 | 6,5 | 8,61 | 4,4 | 6 | 21 | 5 | 4,75 | 7,5 | 7 | 12,5 | 0 | 0 | 0 | 0 | 96,41 |
| ACTUAL (Ha) | SWEET | 7 | 4,15 | 6,5 | 4,61 | 3,2 | 8,8 | 1,75 | 4,7 | 8 | 11,4 | 8 | 15,3 | 2 | 14,8 | | | 100,21 |
| PROJ. ACCUMULATED (Ha) | SWEET | 7 | 13,15 | 19,65 | 28,26 | 32,66 | 38,66 | 59,66 | 64,66 | 69,41 | 76,91 | 83,91 | 96,41 | 96,41 | 96,41 | 96,41 | 96,41 | |
| ACTUAL ACCUMULATED(Ha) | SWEET | 7 | 11,15 | 17,65 | 22,26 | 25,46 | 34,26 | 36,01 | 40,71 | 48,71 | 60,11 | 68,11 | 83,41 | 85,41 | 100,21 | 100,21 | 100,21 | |
| DIFFERENCE | SWEET | 0 | -2 | -2 | -6 | -7,2 | -4,4 | -23,65 | -23,95 | -20,7 | -16,8 | -15,8 | -13 | -11 | 3,8 | 3,8 | 3,8 | |

28.     On June 10, 2016, the replacement seeds arrived in Lima, Peru. Health protocols in Peru require that seeds must be quarantined for approximately thirty to forty days before they

---

[9] This re-seeding caused a variation in the sowing program since it jeopardized the schedule of deliveries to final customers. It also jeopardized the production, since a good production starts with having good seed quality.

can be used. Thus, the new Seeds, assuming they were healthy, could only be ready for sowing by July 27, 2016—about sixty-nine days after the initial germination problem was first reported in the field.

29.     On July 21, 2016, harvesting of 4.7 hectares of Sugar Peas lot # 9401, which adjoined the Sapphire lot, started. The resulting crops were disastrous:

- Pods smaller than 5-centimeters long, making them unfit for export;

- Pods with barely any grain;

- Non-uniform pods, crescent-shaped pods, and pods without grains;

- Genetic problems, including flowering plants that did not create pods, and when they did, the pods did not have grains, rendering them unfit for commercialization;

- Dark brown spots despite extreme care during the harvest, the post-harvest process, and in the chain of cooling.[10]

30.     To understand the apparent cross-contamination situation AVSA requested from SENASA the following: (1) Phytopathogenic Fungi Diagnosis tests on aerial parts of the Plant, (2) Bacteriological Diagnosis of plant material, (3) Mycological Diagnosis of the seed, and (4) Diagnosis of virus on the seeds. The goal was to determine if the Sapphire Seeds contained bacteria or fungus that would have infected other crops through the farm's channels.

31.     On November 8, 2016, SENASA issued the results report of the tests performed on the Sapphires and the Snow Peas variety sown next to them. Both reports showed the presence of Stemphylium Sarciniforme. See SENASA Report Attached as **Exhibit E**. See also Snow Peas SENASA report showing Snow Peas healthy condition prior to sowing at **Exhibit F**.

---

[10] To rule out any problem related to boron and calcium deficiencies, foliar feeding and monitoring was performed—to no avail. Dark brown spots remained and thus, calcium or boron deficiency were ruled out as possible causes.

32.     On December 22, 2016, INIA delivered the final results of additional tests performed on the Sapphires. The results reflected that the Seeds were of extremely poor quality. The germination rate in December was 29%. INIA found 29% of normal seedlings, 29% abnormal ones, and 42% dead seeds. The results also found only 26% of the Seeds were viable. See INIA Report attached as **Exhibit G**.

33.     The INIA report also makes remarkable conclusions regarding the poor condition of the Seeds: insufficient root formation, trapped and atrophied root, more than 50% damage in the cotyledon. All this was evidence, according to the examiner, of the presence of fungus or bacterium. Report at **Ex F**. Moreover, and contrary to Newman's assertions, the presence of bacteria or fungus on Plaintiffs' lands could not have been the result of contamination from Plaintiffs' own land (discussed *infra*), as both Plaintiffs' properties are located in distant regions from each other. The Seeds were planted in different plots in the north, south, and mountainous regions of Peru.

34.     The cause of the 29% germination rate and all the symptoms the Sapphires displayed in the field were further corroborated by the reports of International Seed Testing member SGS laboratories, which found, as stated earlier, several gram-negative bacteria in the Seeds. **Ex. D**.

*The consequences of Corona's reckless commercial practices to AVSA*

35.     In a best-case scenario of 40% average germination rate, the Sapphire Seeds per hectare yield would have decreased from 8,850 kg to 4,425 kg at harvest (with approximately only 3,761 kg being exportable plants). In a normal scenario, the field production cost per 10-pound (4.5 kg) box would be $8.90. However, in this case, it cost $12.39 to produce a 10-pound box of the same crops. The poor quality of the seeds affected approximately 122,882 boxes of

crops, and the $3.49 increase per box resulted in a total production over-expenditure of $428,608. With an average FOB price in the market of $15.70 per box, the plants would no longer be suitable for export or even local sale.

36.     Of the total planned production of 260,670 boxes in the 2016 Campaign, AVSA was only able to produce 185,487 boxes. This difference cost AVSA $1,207,349 in revenue. Additionally, the Peruvian government grants exporters a 4% credit on the total amount of each invoice. These benefits, called "Drawback," factor into the final profitability of an export. These benefits were lost as a result of the damage caused by the Seeds. Overall, this represented an additional loss of $77,848 (121,183 boxes x $16.06 x 4%).

37.     Unfortunately, the damage did not end there. Other pea varieties such as Cascadia, Sugar Bro, Sugar Daddy, and Snow Peas, showed the same symptoms as the Sapphires, and were also unsuitable for commerce. Of the 185,487 boxes actually shipped, 40,000 boxes were either not paid for or were returned by clients, resulting in a $738,819 loss.

38.     Further, Nature Pride (AVSA's largest customer) and Ayco Farms, did not renew their contracts with AVSA in 2017 due to the Sapphire fiasco. The loss of these customers represented a loss of approximately $911,250 in business for AVSA, leaving it virtually bankrupt, and at risk of going out of business.

39.     AVSA has estimated that between unfulfilled orders, loss of cultivable land, returns from customers, cancelled contracts, cleaning expenses, laboratory analyses, and other expenses, Corona has caused AVSA $2,518,757 in monetary damages. This amount does not factor in the damage to its business reputation and the attorney's fees and costs needed to investigate and file this matter.

**2.  The Export of Contaminated Low-Germinating Seeds to Cuyuma**

***The purchase and the complaints to Corona about the seeds***

40.      On or about January 2016, Cuyuma obtained several lucrative contracts for the sale of Pea seeds which in total would require Cuyuma to produce approximately 264,000 kilograms of pea plants.

41.      Thus, on January 25, 2016, Cuyuma entered into a purchase contract with Corona for several Snap and Snow Peas seeds (including the Sapphires). See purchase contract attached as **Exhibit H**. Cuyuma paid for the order on April 11, 2016. The Seeds should have arrived on or about April 28, 2016 but they actually arrived in June 2016.

42.      On June 22, 2016, Cuyuma's Angello Flores ("Flores") warned Newman of the serious production issues and contract penalties Cuyuma was facing due to the delay and the poor-quality Seeds. Flores unequivocally put Newman on notice that this damages would be Corona's responsibility.

43.      The delay alone created substantial problems for Cuyuma. For example, due to the delay, Cuyuma's customers were not able to benefit from a price discount they usually get on early seeding.

44.      Sowing which should have started on May 2016 started on June 2016. Cuyuma planted and raised the Seeds within industry standards regarding temperatures, irrigation and nutrition required for seeds of this type.

45.      During germination, the weakness of the Seeds was notable. Cuyuma reported the issue to Newman in an email on June 9, 2016. Newman, who already knew from AVSA's complaints of the problems with Lot C242606, was quick to make the same recommendation he had given to AVSA—increasing the density of seeds to 3-to-1. Thinking the 3-to-1 strategy

would probably appease Cuyuma, a south American company that he thought would never dare to seek redress, Newman did not bother to disclose the real condition of the Seeds, despite all the risks that the failure to disclose entailed.

46.     As in AVSA's case, Newman's "solution" did not resolve anything, but rather made things much worse. The bad quality of the Sapphires, which were more concentrated than before, caused massive root decay, creating the perfect environment in the land for bacteria present in the Seeds to thrive and contaminate other crops.

***Poor quality of the Seeds corroborated by lab testing.***

47.     The first corroboration of the Seeds' poor quality came from Newman himself. In a June 9, 2016 email to Flores, Newman told him that he had three lab confirmations that the Seeds' germination rate was at best 62%. In other words, Newman's own biased analysis (if he did any analysis at all) showed a substantially lower germination rate than what the Seeds had on its bag label.

48.     Communications between Corona and AVSA show that Newman knew at least since May 2016 of the Seeds' serious problems from AVSA's complaints. Thus, even before Newman did his own testing (if he did at all), he had knowledge that the Seeds were not suitable for commerce.

49.     Cuyuma requested several scientific tests to corroborate what was observed on the field on the Sapphires and to discard any doubt there might be as to the source of the contamination of other crops.

50.     Cuyuma first requested a comprehensive analysis from Doctor Luz Leonor Mattos Calderon ("Mattos")[11]. Mattos categorically concluded that the Sapphires were not adequate for commercial usage.

51.     Mattos performed tests on 400 of the Seeds. Mattos's laboratory analysis showed that there were only 4.5% healthy Seeds, 27.75% with some damage, and that 67.75% of the Seeds did not germinate at all.

52.     Mattos found two types of fungus present: Rhizopus and Penicillium. Further, the bacteria analysis displayed the presence of Pectobacterium or Pseudomanas. Only 4% of Seeds had no fungus and only 36% of Seeds were bacteria-free.

53.     To detect the cause of the problems, Cuyuma ordered from INIA tests on all other seeds planted nearby the Sapphires. INIA concluded the following:

- Sapphire Lot C442808 yielded 84% normal plants;

- OSPI Lot 99033 yielded 96% normal plants;

- Sapphire Lot S042500 yielded 92% normal plants;

- *Sapphire Lot C242606 yielded only 34% normal plants.*

INIA reports are attached as **Exhibit I**. In other words, other than the contaminated Sapphires, the rest of the Seeds were healthy and viable.

54.     Further, according to INIA, Lot C242606 produced 22% abnormal plants; 44% of the seeds tested were dead. The moisture level was 11.67%. That is, only 34% of the Seeds in

---

[11] Mattos is an agricultural engineer, with a Master's degree and two Doctorate degrees in environmental sciences. She has over 35 years of experience as a professor and researcher. For more on Mattos' credentials see http://directorio.concytec.gob.pe/appDirectorioCTI/VerDatosInvestigador.do?id_investigador=2222 (last checked 10.24.17)

Lot C242606 were viable. Corona's label stating that the germination rate of the seeds was 87% was, once again, a gross misrepresentation.[12] **Ex. I**.

55.     As in the Case of AVSA, the damage of the Sapphires did not stay within the Sapphires. SENASA did phytopathogen tests to detect the presence of viruses or bacteria. SENASA found Stemphylum Sarciniforme fungi in plants grown adjacent to the Sapphires, plants that were grown from seeds that were perfectly healthy, with germination rates of 84% or higher. (See ¶ 50 above).

***The consequences of Corona's reckless commercial practices to Cuyuma.***

56.     The deteriorated Sapphires and the subsequent cross-contamination, created massive additional expenses for Cuyuma. The land had to be cleaned, crop yield was dramatically reduced, and virtually the entire Cuyuma 2016 planting was ruined.

57.     During harvesting, plants had visible brown stains. Efforts to minimize the damage substantially increased the labor required (and cost) of the plant selection process. Many of Cuyuma's customers returned shipments because of the poor quality of the plants.

58.     At no point, since Cuyuma was established as a company, has it experienced complaints of this nature from its customers. Further, never before has Cuyuma had so many of its customers return the crops.

59.     The extremely burdensome selection process, the extra labor required, the innumerable returns from customers, the additional overhead required to clean the damaged, contaminated lands, the lab testing expenditures, and the cost of retaining lawyers to investigate and litigate this matter, have caused substantial damages to Cuyuma to the point of jeopardizing its business existence.

---

[12] This is particularly egregious considering that Corona, if it did not know before, already knew from AVSA's complaints that its seed germination rate was far from 87%. Despite knowing, it never informed Cuyuma.

60.     In addition to the concrete, monetary damages suffered, the damage to Cuyuma's business reputation has been catastrophic. Not only has Cuyuma been unable to fulfill existing contractual commitments but it has lost profitable future orders—all of which could have easily been prevented by Corona, had it been truthful regarding the condition of the Seeds.

61.     Cuyuma has estimated that between unfulfilled orders, loss of cultivable land, returns from customers, non-renewal of contracts, cleaning expenses, laboratory analyses, and other expenses, Corona has caused Cuyuma $1,820,166.75 in damages. This amount does not factor in the damage to its business reputation and the attorney's fees and costs needed to investigate and file this matter.

# AVSA

## COUNT I – Breach of Express Warranty.
### *AVSA claim against Corona*

62.     AVSA repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

63.     On or about January 2016 AVSA purchased One Hundred and Fifteen 50-Pound bags of Sapphire Lot 242606.

64.     AVSA paid for the Seeds via wire transfer and in May 2016 Corona delivered the Seeds to AVSA.

65.     The Seeds had a label stating that the germination rate was 87% and the Seeds were labeled as required by law. **Ex. B.**

66.     Corona's label stating that the Seeds' germination rate was 87% was a description of the Seeds, which was made part of the bargain between AVSA and Corona.

67.     Corona orally, on multiple occasions, made affirmations of fact confirming that the Seeds had a germination rate of at least 87%.

68.     The germination rate represented by Corona was a key part of the bargained for exchange in the purchase and sale of the Seeds. AVSA's industry is a small profit margin business and a small difference in the seeds' germination rate would make the seeds unfit for commercial use. AVSA does not purchase seeds with germination rates lower than 85%.

69.     AVSA was aware or made to believe from Corona's statements and labels that the Seeds had a germination rate of 87%.

70.     AVSA effectively relied on the representations made orally by Corona to purchase and then sow the Seeds.

71.     AVSA effectively relied on the representations on Corona's packaging label to purchase the Seeds.

72.     Corona breached this express warranty when it represented that the Seeds had a germination rate of 87% when they actually had a germination rate of 29%.

73.     As a result of Corona's breach of express warranty, AVSA was seriously harmed and suffered substantial monetary damages.

74.     Corona's breach was a substantial factor that caused AVSA's damages. But for Corona's bad Seeds, the damages would not have occurred.

WHEREFORE AVSA respectfully requests a judgment against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and technical investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

## COUNT II– Breach of Implied Warranty.
### *AVSA claim against Corona*

75.   AVSA repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

76.   On or about January 2016 AVSA purchased One Hundred and Fifteen 50-Pound bags of Sapphire Lot 242606.

77.   AVSA paid via wire transfer for the Seeds and, on or about May 2016 Corona delivered the Seeds to AVSA.

78.   At the time of the purchase, Corona was in the business of selling seeds, had specialized knowledge of seeds and agriculture in general, and held itself as an expert in the seed industry. Moreover, Corona held itself as having particular expertise and knowledge of the Sapphire type of seeds at issue in this case.

79.   Corona represents to the public in its website that it has been selling vegetable and herb seeds to commercial growers since 1992.

80.   Corona knew AVSA was relying on its expertise to purchase the product.

81.   AVSA in fact relied on Corona's expertise in the seed industry to purchase the Sapphires. Had AVSA known that Corona was not knowledgeable in the Seed industry, AVSA would not have purchased the Seeds.

82.     The Seeds had a label stating that the germination rate was 87%.

83.     AVSA, does not purchase seeds with germination rates lower than 85% as such seeds would not be viable for commercial use.

84.     Corona's Seeds had a germination rate of 29% and as such the Seeds were not of the same quality as those generally acceptable in the agriculture industry. The Seeds also presented several gram-negative bacteria, such as Pantoea SP, Enterobacteriaceae, Erwinia SP, and Acinetobacter SP.

85.     Corona's Seeds were not adequately contained, packaged, or labeled, since the Seeds' label showed a germination rate far higher than the actual 29% rate they had and were infected with bacteria.

86.     Corona's Seeds were not fit for the ordinary purpose for which seeds are used since they were infected with gram-negative bacteria that dramatically affected its germination rate, and was also an imminent risk to growers' lands and crops.

87.     Corona's Seeds did not measure up to the promises or facts stated on the label.

88.     As a result of Corona's breach of the implied warranty, AVSA suffered substantial damages.

WHEREFORE AVSA respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f)  the damage to its business reputation,

(g)  the cost of laboratory analyses and technical investigations, and

(h)  the attorney's fees and costs required to investigate and file this matter.

### COUNT III– Negligence
#### *AVSA claim against Corona*

89.      AVSA repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

90.      On or about January 2016 AVSA purchased One Hundred and Fifteen 50-Pound bags of Sapphire Lot 242606.

91.      AVSA paid via wire transfer for the Seeds and, on or about May 2016 Corona delivered the Seeds to AVSA.

92.      At the time of the purchase, Corona was in the business of selling seeds, had specialized knowledge of seeds and agriculture in general, and held itself out as an expert in the seed industry.

93.      Having specialized knowledge of seeds, Corona had a duty to conform to a standard of conduct that protects others against unreasonable risks.

94.      When Corona shipped the Seeds infected with bacteria and a germination rate of 29%, Corona failed to conform to the standard of care required to protect others from harm.

95.      Corona's failure to act with care when it shipped the contaminated Seeds to AVSA was the proximate cause of AVSA's losses in that had AVSA not planted Corona's Seeds, or known of its real condition, its damages would not have occurred.

96.      AVSA suffered substantial damages as a result of Corona's breach of its duty of care.

WHEREFORE AVSA respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and technical investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

## COUNT IV– Negligent Misrepresentation
### AVSA claim against Corona

97.     AVSA repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

98.     On or about January 2016 AVSA purchased One Hundred and Fifteen 50-pound bags of Sapphire Lot 242606.

99.     AVSA paid via wire transfer for the Seeds and, on or about May 2016 Corona delivered the Seeds to AVSA.

100.    At the time of the purchase, Corona was in the business of selling seeds, had specialized knowledge of seeds and agriculture in general, and held itself out as an expert in the seed industry.

101.    At the time of the purchase, Corona knew or should have known that the Seeds did not have a germination rate of 87%.

102.   At the time of the purchase, Corona knew or should have known that the Seeds were infected with bacteria.

103.   The Seeds did not have a germination rate of 87% and were not in suitable condition for commercial sale.

104.   Corona misrepresented a material fact regarding the Seeds, i.e., that the germination rate was 87% when it was in fact 29%.

105.   Corona did not have reasonable grounds to believe that the 87% germination he placed on the Seeds label was true.

106.   Corona represented that the Seeds had an 87% germination rate with the intent to induce AVSA to purchase the Seeds.

107.   AVSA did in fact rely on Corona's printed and oral statements regarding the germination rate and general condition of the Seeds to purchase them.

108.   AVSA was justified in its reliance in Corona's statement, as AVSA knew Corona was a knowledgeable Seed company and held itself out as such. AVSA had no reason to believe that representations on Corona's labels were false.

109.   Corona's misrepresentation of the condition of the Seeds caused AVSA substantial damages in that had AVSA not planted Corona's Seeds, or known of its real condition, its damages would not have occurred.

WHEREFORE AVSA respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

## COUNT V– Violation of California Food and Agricultural Code § 52452
### AVSA claim against Corona

110.    AVSA repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

111.    On or about January 2016 AVSA purchased One Hundred and Fifteen 50-Pound bags of Sapphire Lot 242606.

112.    AVSA paid via wire transfer for the Seeds and, on or about May 2016 Corona delivered the Seeds to AVSA.

113.    California Food and Agricultural Code requires that sellers must place on each container of agricultural seed "in a conspicuous place a plainly written or printed label . . . [of] the percentage of germination exclusive of hard seed, the percentage of hard seed, if present, and the calendar month and year the test was completed to determine the percentages."[13]

114.    Corona wrote on the Seeds' label that the germination rate was 87%.

115.    Corona said on its label that the test to determine the germination rate was done on November 2015.

116.    The Seeds did not have an 87% germination rate in November 2015, at the time they were shipped from California, nor at the time they arrived at AVSA, a germination rate of 87%.

---

[13] Cal. Food & Agr. Code, § 52452(a)(7) (Deering 2017).

117.    Corona sent Seeds to AVSA with a germination rate of 29% in violation Section 52452.

118.    At the time of the purchase, Corona knew or should have known that the Seeds did not have a germination rate of 87% and that they were not suitable for commerce.

119.    Despite knowing this, or having constructive knowledge thereof, Corona did not accurately label the Seeds' bags as required by Section 52452, which was designed to protect buyers like AVSA from sellers' misrepresentations.

120.    Corona's violation of § 52452 was the proximate cause of AVSA's substantial damages known of the real condition of the Seeds, it would have not planted the Seeds and its damages would not have occurred.

WHEREFORE AVSA respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

### COUNT VI – Violation of the Federal Seed Act
*AVSA claim against Corona*

121.    AVSA repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

122.     On or about January 2016 AVSA purchased One Hundred and Fifteen 50-pound bags of Sapphire Lot 242606.

123.     AVSA paid via wire transfer for the Seeds and, on or about May 2016 Corona delivered the Seeds to AVSA.

124.     The Federal Seed Act establishes that "[i]t shall be unlawful for any person to transport or deliver for transportation in interstate commerce . . . unless each container bears a label giving the following information . . . : [f]or each agricultural seed, in excess of 5 per centum of the whole, . . . and each kind or variety or type of agricultural seed shown in the labeling to be present in a proportion of 5 per centum or less of the whole, (A) percentage of germination, exclusive of hard seed, (B) percentage of hard seed, if present, and (C) the calendar month and year the test was completed to determine such percentages. . ."[14]

125.     Further, the Federal Seed Act makes it unlawful to sell "[a]ny agriculture or vegetable seed unless the test to determine the percentage of germination . . . shall have been completed within a five-month period . . ."[15] and "[a]ny agricultural seeds or vegetable seeds having a false labeling, or pertaining to which there has been a false advertisement, or to sell or offer for sale such seed for interstate shipment by himself or others."[16]

126.     Corona wrote on the Seeds' label that the germination rate was 87%.

127.     Corona also wrote on its label that the test to determine the germination rate was done on November 2015 more than five months prior to the delivery of the Seeds.

128.     The Seeds did not have in November 2015, at the time they were shipped from California, nor at the time they arrived at AVSA, a germination rate of 87%.

---

[14] Federal Seed Act, 7 U.S.C. § 1571 (a)(8) (LexisNexis current through PL 115-68, approved 10/06/17).
[15] Federal Seed Act, 7 U.S.C. § 1571(c) (LexisNexis current through PL 115-68, approved 10/06/17).
[16] Federal Seed Act, 7 U.S.C. § 1571(d) (LexisNexis current through PL 115-68, approved 10/06/17).

129.    Corona sent Seeds to AVSA with a germination rate of 29% in violation of the Federal Seed Act.

130.    Corona did not perform the required germination tests within five months of shipping as required by the Federal Seed Act.

131.    Corona delivered for transportation in interstate commerce seeds having false labeling or seeds pertaining to which there was a false advertisement in violation of the Federal Seed Act.

132.    At the time of the purchase, Corona knew or should have known that the Seeds did not have a germination rate of 87% and that they were not suitable for commerce and that their sale was prohibited by the Federal Seed Act.

133.    Despite knowing this, or having constructive knowledge thereof, Corona delivered for transportation interstate commerce seeds that violated the requirements of the Federal Seed Act.

134.    Corona's violations of the Federal Seed Act were the proximate cause of AVSA's substantial damages in that had AVSA known of the real condition of the Seeds, it would have not planted the Seeds and its damages would not have occurred.

WHEREFORE AVSA respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

   (a) the money it paid for the Seeds,

   (b) the loss resulting for the unfulfilled contracts with its customers,

   (c) the loss of other crops by cross-contamination,

   (d) the cost of cleaning the land,

   (e) the loss of lucrative contracts and customers,

(f)  the damage to its business reputation,

(g)  the cost of laboratory analyses and technical investigations, and

(h)  the attorney's fees and costs required to investigate and file this matter.

### COUNT VII – Breach of Contract
#### *AVSA claim against Corona*

135.    AVSA repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

136.    On or about January 2016 AVSA and Corona entered into a valid contract for the purchase and sale of 117 50-pound bags of Sapphire Lot 242606 and two 50-pound bags of Sugar Bro seeds. See Contract Attached as **Ex. A.**

137.    AVSA paid via wire transfer $26,400, the amount designated in the contract for the Seeds.

138.    In May 2016 Corona delivered the Seeds to AVSA. The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B**.

139.    Corona's label stating that the germination rate was 87% was a description of the Seeds which was made part of the bargain between AVSA and Corona.

140.    Corona orally, on multiple occasions, made affirmations of fact confirming that the Seeds had a germination rate of at least 87%.

141.    The germination rate represented by Corona was a key part of the bargained for exchange in the purchase and sale of the Seeds. AVSA's industry is a small profit margin business and a small difference in the seeds' germination rate would make the seeds unfit for commercial use. AVSA does not purchase seeds with germination rates lower than 85%.

142.    AVSA was aware or made to believe from Corona's statements and labels that the Seeds indeed had a germination rate of 87%.

143.   AVSA effectively relied on the representations made orally by Corona to enter into a contract with Corona.

144.   AVSA effectively relied on the representations on Corona's packaging label that the seeds' germination rate was 87% to purchase and accept the Seeds.

145.   Corona materially breached the contract when it delivered Seeds with a 29% germination rate.

146.   Corona materially breached the contract when it delivered deteriorated Seeds infected with bacteria.

147.   As a result of Corona's breach of the contract, AVSA was seriously harmed and suffered substantial monetary damages.

148.   Corona's breach was the proximate cause AVSA's damages. But for Corona's bad Seeds, the damages would not have occurred.

WHEREFORE Plaintiff respectfully requests a judgment against Defendant for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and technical investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

## CUYUMA

### COUNT VIII – Breach of Express Warranty
### *Cuyuma's claim against Corona*

149.    Cuyuma repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

150.    On or about January 2016 Cuyuma purchased Seventy-One 50-pound bags of Sapphire Lot 242606.

151.    Cuyuma paid via wire transfer for the Seeds. On May 2016 Corona delivered the Seeds and on or about June 2016, the Seeds arrived at Cuyuma.

152.    The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B**.

153.    Corona's label stating that the germination rate was 87% was a description of the Seeds which was made part of the bargain between Cuyuma and Corona.

154.    Corona orally, on multiple occasions, made affirmations of fact confirming that the Seeds had a germination rate of at least 87%.

155.    The germination rate represented by Corona was a key part of the bargained for exchange in the purchase and sale of the Seeds. Cuyuma's industry is a small profit margin business and a small difference in seeds' germination rate would make the seeds unfit for commercial use. Cuyuma does not purchase seeds with germination rates lower than 85%.

156.    Cuyuma was aware or made to believe from Corona's statements and labels that the Seeds had a germination rate of 87%.

157.    Cuyuma effectively relied on the representations made orally by Corona to purchase and then sow the Seeds.

158.    Cuyuma effectively relied on the representations on Corona's packaging label that the seeds' germination rate was 87% to purchase and accept the Seeds.

159.    Corona breached the express warranty when it represented that the Seeds had a germination rate of 87% when they actually had a germination rate of 29%.

160.    As a result of Corona's breach of express warranty, Cuyuma was seriously harmed and suffered substantial monetary damages.

161.    Corona's breach was a substantial factor that caused Cuyuma's damages. But for Corona's bad Seeds, the damages would not have occurred.

WHEREFORE Cuyuma respectfully requests a judgment against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analysis and technical investigation, and

(h) the attorney's fees and costs required to investigate and file this matter.

## COUNT IX– Breach of Implied Warranty.
### *Cuyuma's claim against Corona*

162.    Cuyuma repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

163.    On or about January 2016 Cuyuma purchased Seventy-One 50-pound bags of Sapphire Lot 242606.

164.   Cuyuma paid via wire transfer for the Seeds. On May 2016 Corona delivered the Seeds and on or about June 2016, the Seeds arrived at Cuyuma.

165.   The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B**.

166.   At the time of the purchase, Corona was in the business of selling seeds, had specialized knowledge of seeds and agriculture in general, and held itself out as an expert in the seed industry. Moreover, Corona held itself out as having particular expertise in and knowledge of the Sapphire seeds at issue in this case.

167.   Corona represents to the public in its website that it has been selling vegetable and herb seed to commercial growers since 1992.

168.   Corona knew Cuyuma was relying on its expertise to purchase the product.

169.   Cuyuma in fact relied on Corona's expertise in the seed industry to purchase the Sapphires. Had Cuyuma known that Corona was not knowledgeable in the Seed industry, Cuyuma would not have purchased the Seeds.

170.   The Seeds had a label stating that the germination rate was 87%.

171.   Cuyuma, does not purchase seeds with germination rates lower than 85% as such seeds would not be viable for commercial use.

172.   Corona's Seeds had a germination rate of 29% and as such the Seeds were not of the same quality as those generally acceptable in the agriculture industry. The Seeds were also infected with several gram-negative bacteria, such as Pantoea SP, Enterobacteriaceae, Erwinia SP, and Acinetobacter SP.

173.   Corona's Seeds were not adequately contained, packaged, or labeled, since the Seeds' label showed a germination rate far higher than the actual 29% rate they had and were infected with bacteria.

174.   Corona's Seeds were not fit for the ordinary purpose for which seeds are used since they were infected with gram-negative bacteria that dramatically affected its germination rate, and presented an imminent risk to growers' lands and crops.

175.   Corona's Seeds did not measure up to the promises or facts stated on the label.

176.   As a result of Corona's breach of the implied warranty, Cuyuma suffered substantial damages.

WHEREFORE Cuyuma respectfully requests judgment to be entered in its favor against Defendant for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and technical investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

### COUNT X– Negligence
*Cuyuma's claim against Corona*

177.   Cuyuma repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

178.    On or about January 2016 Cuyuma purchased Seventy-One 50-Pound bags of Sapphire Lot 242606.

179.    Cuyuma paid via wire transfer for the Seeds. In May 2016 Corona delivered the Seeds and on or about June 2016, the Seeds arrived at Cuyuma.

180.    The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B**.

181.    At the time of the purchase, Corona was in the business of selling seeds, had specialized knowledge of seeds and agriculture in general, and held itself out as an expert in the seed industry.

182.    Having specialized knowledge of seeds, Corona had a duty to conform to a standard of conduct that protects others against unreasonable risks.

183.    When Corona shipped the Seeds with bacteria and a germination rate of 29% Corona failed to conform to the standard of care required to protect others from harm.

184.    Corona's failure to act with care when it shipped the contaminated Seeds to Cuyuma was the proximate cause of Cuyuma's of losses in that had Cuyuma not planted Corona's Seeds, or known of its real condition, its damages would not have occurred.

185.    Cuyuma suffered substantial damages as a result of Corona's breach of its duty of care.

WHEREFORE Cuyuma respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and technical investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

**COUNT XI– Negligent Misrepresentation**
*Cuyuma's claim against Corona*

186.    Cuyuma repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

187.    On or about January 2016 Cuyuma purchased Seventy-One 50-pound bags of Sapphire Lot 242606.

188.    Cuyuma paid via wire transfer for the Seeds. On May 2016 Corona delivered the Seeds and on or about June 2016, the Seeds arrived at Cuyuma.

189.    The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B**.

190.    At the time of the purchase, Corona was in the business of selling seeds, had specialized knowledge of seeds and agriculture in general, and held itself out as an expert in the seed industry.

191.    At the time of the purchase, Corona knew or should have known that the Seeds did not have a germination rate of 87%.

192.    At the time of the purchase, Corona knew or should have known that the Seeds had problems with bacteria.

193.    The Seeds did not have a germination rate of 87% and were not in suitable condition for commercial sale.

194.    Corona misrepresented a material fact regarding the Seeds, i.e., that the germination rate was 87% when it was in fact 29%.

195.    Corona did not have reasonable grounds to believe that the 87% germination it claimed on the Seeds' label was true.

196.    Corona represented that the Seeds had an 87% germination rate with the intent to induce Cuyuma to purchase the Seeds.

197.    Cuyuma did in fact rely on Corona's printed and oral statements regarding the germination rate and general condition of the Seeds to purchase them.

198.    Cuyuma was justified in its reliance on Corona's statement, as Cuyuma knew Corona was a knowledgeable Seed company and held itself out as such. Cuyuma had no reason to believe that the representations on Corona's labels were false.

199.    Corona's misrepresentation of the condition of the Seeds caused Cuyuma substantial damages in that had Cuyuma known of its real condition, it would not have planted the Seeds and its damages would not have occurred.

WHEREFORE Cuyuma respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

## COUNT XII– Violation of California Food and Agricultural Code § 52452
### *Cuyuma's claim against Corona*

200.    Cuyuma repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

201.    On or about January 2016 Cuyuma purchased Seventy-One 50-pound bags of Sapphire Lot 242606.

202.    Cuyuma paid via wire transfer for the Seeds. On May 2016 Corona delivered the Seeds and on or about June 2016, the Seeds arrived at Cuyuma.

203.    The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B**.

204.    Section 52452 of the California Food and Agricultural Code requires that sellers must place in each container "in a conspicuous place a plainly written or printed label [of] . . . (7) . . . (1), the percentage of germination exclusive of hard seed, the percentage of hard seed, if present, and the calendar month and year the test was completed to determine the percentages."[17]

205.    Corona's labels stated that the Seeds' germination rate was 87%.

206.    Corona's Seeds' label also claimed that the test to determine the germination rate was done on November 2015.

207.    The Seeds did not have an 87% germination rate in November 2015, at the time they were shipped from California, nor at the time they arrived at Cuyuma.

208.    Corona sent Seeds to Cuyuma with a germination rate of 29% in violation of Section 52452 of the California Food and Agricultural Code.

---

[17] Food & Agr. Code, § 52452 (Deering, Lexis Nexis 2017).

209.    At the time of the purchase, Corona knew or should have known that the Seeds did not have a germination rate of 87% and that they were thus unsuitable for commerce.

210.    Despite knowing this, or having constructive knowledge thereof, Corona did not accurately label the Seeds' bags as required by Section 52452 which was designed to protect seed buyers like Cuyuma from sellers' misrepresentations.

211.    Corona's violation of Section 52452 was the proximate cause of Cuyuma's substantial damages in that had Cuyuma known of its real condition, it would not have planted the Seeds and its damages would not have occurred.

WHEREFORE Cuyuma respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

### COUNT XIII – Violation of the Federal Seed Act
#### *Cuyuma's claim against Corona*

212.    Cuyuma repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

213.    On or about January 2016 Cuyuma purchased Seventy-One 50-pound bags of Sapphire Lot 242606.

214. Cuyuma paid via wire transfer for the Seeds. In May 2016 Corona delivered the Seeds and on or about June 2016, the Seeds arrived at Cuyuma.

215. The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B**.

216. The Federal Seed Act establishes that "[i]t shall be unlawful for any person to transport or deliver for transportation in interstate commerce . . . unless each container bears a label giving the following information . . . : [f]or each agricultural seed, in excess of 5 per centum of the whole, . . . and each kind or variety or type of agricultural seed shown in the labeling to be present in a proportion of 5 per centum or less of the whole, (A) percentage of germination, exclusive of hard seed, (B) percentage of hard seed, if present, and (C) the calendar month and year the test was completed to determine such percentages. . ."[18]

217. Further, the Federal Seed Act makes it unlawful to sell "[a]ny agriculture or vegetable seed unless the test to determine the percentage of germination . . . shall have been completed within a five-month period . . ."[19] and "[a]ny agricultural seeds or vegetable seeds having a false labeling, or pertaining to which there has been a false advertisement, or to sell or offer for sale such seed for interstate shipment by himself or others."[20]

218. Corona wrote on the label of the Seeds that the germination rate was 87%.

219. Corona's label also represented that the test to determine the Seeds' germination rate was done on November 2015, more than five months prior to the delivery of the Seeds.

220. The Seeds did not have a germination rate of 87% in November 2015, at the time they were shipped from California, nor at the time they arrived at Cuyuma.

---

[18] 7 U.S.C. § 1571 (a)(8) (LexisNexis, Lexis Advance through PL 115-68, approved 10/06/17).
[19] 7 U.S.C. § 1571 (c) (LexisNexis, Lexis Advance through PL 115-68, approved 10/06/17).
[20] *Id.* at (d)

221.    Corona sent Seeds to Cuyuma with a germination rate of 29% in violation the Federal Seed Act.

222.    Corona did not perform the required germination tests within 5 months of shipping as required by the Federal Seed Act.

223.    Corona delivered for transportation in interstate commerce seeds having false labeling or seeds pertaining to which there was a false advertisement in violation of the Federal Seed Act.

224.    At the time of the purchase, Corona knew or should have known that the Seeds did not have a germination rate of 87% and that they were not suitable for commerce and that their sale was thus in violation of the Federal Seed Act.

225.    Despite knowing this, or having constructive knowledge thereof, Corona delivered for transportation in interstate commerce seeds that violated the requirements of the Federal Seed Act.

226.    Corona's violations of the Federal Seed Act were the proximate cause of Cuyuma's substantial damages.

WHEREFORE Cuyuma respectfully requests judgment to be entered in its favor against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and technical investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

### COUNT XIV – Breach of Contract
*Cuyuma's claim against Corona*

227.    Cuyuma repeats the allegations in paragraphs 1 through 61 inclusive and incorporates them by reference in this Count.

228.    On or about January 2016 Cuyuma and Corona entered into a valid contract for the purchase and sale of 156 50-pound bags of Sapphire Lot 242606 and other seeds. See contract attached as **Ex. H.**

229.    Cuyuma paid via wire transfer $20,515, the amount designated in the contract for the Seeds.

230.    On June 2016 Corona delivered the Seeds. The Seeds had a label stating that the germination rate was 87% and that the Seeds were labeled as required by law. **Ex. B.**

231.    Corona's label stating that the germination rate was 87% was a description of the Seeds, which was made part of the bargain between Cuyuma and Corona.

232.    Corona orally, on multiple occasions, made affirmations of fact confirming that the Seeds had a germination rate of at least 87%.

233.    The germination rate represented by Corona was a key part of the bargained for exchange in the purchase and sale of the Seeds. Cuyuma's industry is a small profit margin business and a small difference in the seeds' germination rate would make the seeds unfit for commercial use. Cuyuma does not purchase seeds with germination rates lower than 85%.

234.    Cuyuma was aware or made to believe from Corona's statements and labels that the Seeds had a germination rate of 87%.

235.   Cuyuma effectively relied on the representations made orally by Corona to enter into a contract with Corona.

236.   Cuyuma effectively relied on the representations on Corona's packaging label that the Seeds had an 87% germination rate to accept the Seeds.

237.   Corona materially breached the contract when it delivered Seeds with a 29% germination rate.

238.   Corona materially breached the contract when it delivered deteriorated Seeds infected with bacteria.

239.   As a result of Corona's breach of the contract, Cuyuma was seriously harmed and suffered substantial monetary damages.

240.   Corona's breach was the proximate cause Cuyuma's damages in that had Cuyuma known of the real condition of the Seeds, it would not have planted the Seeds and its damages would not have occurred.

WHEREFORE Cuyuma respectfully requests a judgment against Corona for the damages it caused including but not limited to:

(a) the money it paid for the Seeds,

(b) the loss resulting for the unfulfilled contracts with its customers,

(c) the loss of other crops by cross-contamination,

(d) the cost of cleaning the land,

(e) the loss of lucrative contracts and customers,

(f) the damage to its business reputation,

(g) the cost of laboratory analyses and technical investigations, and

(h) the attorney's fees and costs required to investigate and file this matter.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

Eduardo Ayala Maura, Esq.
Attorney for Plaintiffs (main counsel)
**Ayala Law P.A.**
1390 Brickell Avenue, Suite 335
Miami, Florida 33131
Telephone:  305.570.2208
Facsimile: 305.305.7206
E-mail: eayala@ayalalawpa.com


By: *s/Eduardo Ayala Maura*
       Eduardo Ayala Maura
       Florida Bar No. 91303


Brian Nomi, Esq.
Attorney for Plaintiff (local counsel)
**Law Office of Brian Nomi**
215 E/ Daily Drive, Suite 28
Camarillo, California 93010
Telephone:  805.444.5960
Facsimile: 805.357.5333
E-mail: briannomi@yahoo.com


By: _____
       Brian Nomi
       California Bar No. 203059