**HORTON, OBERRECHT, KIRKPATRICK & MARTHA**
Cheryl A. Kirkpatrick, Esq. (SBN 149906)
Peter C.L. Chen, Esq. (SBN 246720)
3 Park Plaza, Suite 350
Irvine, CA 92614
PH:  (949) 251-5100
FX:  (949) 251-5104
Email: ckirkpatrick@hortonfirm.com / pchen@hortonfirm.com

Attorneys for Defendant Corona Seeds, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Agricola Cuyuma SA;<br>Corporacion Agricola Vinasol SAC;<br><br>               Plaintiffs,<br>v.<br><br>Corona Seeds, Inc.;<br><br>               Defendant. | **CASE NO. 2:17-cv-8220 DMG (SKx)**<br><br>**CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>**[Filed Concurrently with Notice of Motion; Separate Statement of Uncontroverted Facts; Declaration of Peter C.L. Chen; [Proposed] Order]**<br><br>**District Judge: Hon. Dolly M. Gee**<br><br>**Date: December 20, 2019**<br>**Time: 3:00 p.m.**<br>**Courtroom: 8C, 8th Floor**<br><br>Complaint Served: December 21, 2017<br>Current Trial Date: February 11, 2020<br><br>Judge: Hon. Dolly M. Gee<br>Magistrate: Hon. Steve Kim |

///
///
///
///

# TABLE OF CONTENTS

Table of Authorities……………………………………………………………... iii

MEMORANDUM OF POINTS AND AUTHORITIES …………………… 1

1. INTRODUCTION……………………………………………………… 2

2. MEET-AND-CONFER EFFORTS………………………………… 4

3. STATEMENT OF FACTS………………………………………… 4

   A. Procedural Background …………………………………..…… 4

   B. Sapphire Seeds From Lot C242606 ………………………… 4

   C. Germination …………………………………………………… 5

   D. AVSA ………………………………………………………… 5

   E. CUYUMA …………………………………………………... 8

   F. Disease Allegations ………………………………………… 9

4. LEGAL STANDARD………………………………………..……… 11

5. CORONA IS ENTITLED TO SUMMARY JUDGMENT, OR

   ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT………….. 12

   A. CORONA Did Not Make Any Express Warranties ………………… 12

   B. The Limitation of Remedies Clause is Valid ……………………... 13

   C. CORONA Made No Implied Warranties …………………………… 14

   D. Plaintiffs Cannot Maintain Their Breach of Contract Claims ……… 15

   E. Plaintiffs' Cannot Maintain Their Negligent Misrepresentation

   Claim ………………………………………………………… 16

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F.  Plaintiffs Cannot Maintain Their Negligence Cause of Action ......  17

CONCLUSION ………………………………………………..  19

**TABLE OF CONTENTS**

# TABLE OF AUTHORITIES

## CASE LAW

Anderson v. Liberty Lobby, Inc. (1986) 477 U.S. 242, 249     11
Avirgan v. Hull (11th Cir. 1991) 932 F.2d 1572, 1577     11
Bily v. Arthur Young & Co. (1992) 3 Cal.4th 370, 407-408     16
Celotex Corp. v. Catrett (1986) 477 U.S 317, 322, 324-26     11
Kesner v. Superior Court (2016) 1 Cal.5th 1132, 1143     17
Ladd v. County of San Mateo (1996) 12 Cal.4th 913, 917     17
Marr Enters, Inc. v. Lewis Refrigeration (9th Cir. 1977) 556 F.2d 951, 955     14
Milgard Tempering, Inc. v. Selas Corp. of Am. (9th Cir. 1990)
902 F.2d 703, 709     13
Nat'l Rural Tele. Coop. v. DIRECTV, Inc. (C.D. Cal 2003)
319 F.Supp.2d 1040, 1048     13
Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co. (1988)
200 Cal.App.3d 1518, 1533     14
Rowland v. Christian (1968) 69 Cal.2d 108, 112     17, 18
Weinstat v. Dentsply Int'l, Inc. (2010) 180 Cal.App. 4th 1213, 1218     12

## CALIFORNIA CIVIL CODE

Section 1710     16

## CALIFORNIA COMMERCIAL CODE

Section 1213     12
Section 2316     12, 13
Section 2719(1)     13
Section 2719(2)     13

**TABLE OF AUTHORITIES**

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Corona Seeds, Inc. (hereinafter referred to as "CORONA") submits this memorandum of points & authorities in support of its motion for summary judgment, or alternatively, partial summary judgment against the causes of action alleged in plaintiffs Agricola Cuyuma SA ("CUYUMA") and Corporacion Agricola Vinasol SAC ("AVSA") (collectively "PLAINTIFFS") third amended and operative complaint ("TAC").

### 1. INTRODUCTION

This lawsuit arises from the sale of certain pea seeds by CORONA to AVSA and CUYUMA in March and April 2016.  PLAINTIFFS are commercial growers of crops in Peru.  The seeds at issue are Sapphire pea seeds from Lot C242606.  Crites Seeds, Inc. ("CRITES") supplied the seeds to CORONA. Prior to the sale of the seeds, Eurofins, an independent testing laboratory, tested a sample of Lot C242606 to assess germination. Testing on this sample in November 2015 indicated germination of 87%. CORONA had no role in the germination testing performed by CRITES. CRITES packed the seeds into bags supplied by CORONA at CRITES' facilities.

PLAINTIFFS made no communications concerning germination to CORONA during the transactions. Similarly, PLAINTIFFS made no requests to CORONA for any testing, whether for germination, disease, or something else. Notably, language in the invoices indicate that CORONA disclaims all warranties, limited PLAINTIFF' remedies, and advised PLAINTIFFS that the seeds have not been tested for disease.  Identical or similar language was prominently displayed on the bags and label for the subject seeds. PLAINTIFFS signed the invoices and do not dispute the disclaimer or limitation language.

CRITES performed in-house germination testing on retained samples of Lot C242606 after delivering the seeds.  At that point, CRITES discovered that germination rates fell. CRITES, however, ***did not*** communicate the results of such testing until *after* AVSA informed CORONA of germination issues in late May 2016. CORONA

voluntarily advised CUYUMA of the germination issue thereafter. CORONA sent replacement seeds to AVSA and CUYUMA free of charge.

Here, the Eurofins test indicated that, as of November 2015, the tested seeds had a germination rate of 87%. The germination rate is indicative of the germination rate of the sample seeds at the time it was tested, under laboratory conditions. It is not, nor is it intended to be, an indicator or guarantee of 87% germination in the real world. In addition, CORONA had no reason to believe the Eurofins test was inaccurate because CRITES did not advise CORONA of the results of its post-sale in-house testing until later. In addition, the drop in germination cannot be considered a latent defect because PLAINTIFFS could have performed a germination test prior to planting and PLAINTIFFS knew how to conduct such testing.

Because the parties never discussed germination during the sale of the seeds, and the Eurofins test indicates merely that samples were tested to have a germination rate of 87%, CORONA did not expressly warrant that Lot C242606 somehow had a "real world" germination rate of 87%. Importantly, a seed germinating into a plant involves a multitude of factors that are completely outside the control of CORONA. In addition, PLAINTIFFS did not ask CORONA to test for any disease to the subject seeds despite being advised of the possibility of disease in the invoice documents. Thus, CORONA did not make any express warranties concerning the germination of Lot C242606 and had no reason to know of the decreased germination rate. CORONA, per the remedies clause, sent replacement seeds to PLAINTIFFS free of charge.

Moreover, the test results PLAINTIFFS rely on do not actually support their claims. The diseases that PLAINTIFFS contend the subject seeds were infected with are not diseases. Almost all consist of fungus and/or bacteria that is prevalent in nature, including Peru. Similarly, most of the identified fungus and/or bacteria are not known to be pathogenic to peas, including the subject seeds. Furthermore, one particular test PLAINTIFFS rely on do not even indicate whether the DNA identified is dead or alive.

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

Moreover, certain testing was not performed pursuant to international standards. Thus, PLAINTIFFS do not have sufficient evidence that CORONA's conduct resulted in harm. Accordingly, the Court should grant CORONA's motion for summary judgment, or alternatively, for partial summary judgment.

## 2. MEET-AND-CONFER EFFORTS

Prior to filing this motion, CORONA's counsel met and conferred with PLAINTIFFS' counsel telephonically and via email, in compliance with the Court's Standing Order and applicable Local Rules.   *See Declaration of Peter C.L. Chen* ¶ 2.

## 3. STATEMENT OF FACTS

### A.        Procedural Background

This is a lawsuit brought by plaintiffs CUYUMA and AVSA against a seed distributor, CORONA. Plaintiffs filed their initial complaint on December 21, 2017. Plaintiffs ultimately filed a third amended, and operative, complaint ("TAC") on February 25, 2019.  The TAC named, for the first time, CRITES.  The TAC alleges the following causes of action: 1) Breach of Express Warranty; 2) Breach of Implied Warranty; 3) Negligence; 4) Negligent Misrepresentation; 5) Breach of Contract; 6) Strict Products Liability (Crites only); 7) Negligence.  CORONA answered the TAC on March 11, 2019 while CRITES answered on April 25, 2019.

### B.        SAPPHIRE SEEDS FROM LOT C242606

The seeds at issue in this litigation are Sapphire seeds from Lot C242606.  These are sugar snap pea seeds. The subject seeds CORONA sold to PLAINTIFFS were supplied by CRITES, a seed supplier / manufacturer. CRITES placed the subject seeds in bags provided by CORONA, sealed the bags, and sent them to CORONA. (Separate Statement of Uncontroverted Facts ("UMF") No. 1).  The subject seeds were tested by Eurofins, a third-party testing agency, prior to shipment.  The results indicated that a test of the sample pulled from Lot C242606, as of November 2015, had a germination rate of 87%.  (UMF No. 2). CRITES affixed a label to the bags, indicating that, as of November

4

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

2015, the germination rate was 87% as to the tested samples.  (UMF No. 3).  The seeds were then treated with a fungicide called Thiram, bagged, sealed, and shipped to CORONA. (UMF No. 4).

After the subject seeds were shipped to CORONA, CRITES performed germination testing on retained samples treated with Thiram.  Testing revealed that germination dropped. (UMF No. 5).  This was unexpected as Thiram treatment typically results in an increase in germination rates. CRITES, however, did not communicate the lowered germination figures to CORONA until *after* AVSA communicated concerns with the seed's germination in late May 2016 (see below). (UMF No. 6).

### C.      Germination

Eurofins tested sample seeds from Lot C242606 in November 2015.  The testing revealed a germination rate of 87%.  (UMF No. 2).  This test indicates only that, as of the time of testing, and on the tested seeds, that 87% of the seeds germinated under laboratory conditions.  The germination rate of 87% does not indicate that 87% of the seed would germinate under "real world" field conditions, as germination is affected by a multitude of factors after the seed is received by the grower, including but not limited to: 1) seed storage and handling; 2) length of storage; 3) transportation; 4) ground preparation; 5) planting method; 6) irrigation and soil moisture; 7) weather and environment; 8) application of chemicals; 9) non-emergence factors due to damage by soil-borne insects or infection by soil-borne pathogens; 10) seed predation; and 11) mis-diagnosis of post-emergence problems as seed germination issues. Laboratory germination rate is not a guarantor nor is it intended to mean that all seeds from that particular lot will actually germinate at the rate tested. (UMF No. 7)

### D.      AVSA

AVSA is a commercial grower and exporter of agricultural produce in Peru and has been in business since 2001.  (UMF No. 8). AVSA placed an order for certain seeds, including Sapphire seeds from Lot C242606, from CORONA in January 2016 for

5

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

$26,400. (UMF No. 9). The subject seeds were treated with Thiram. (UMF No. 10). No one from AVSA or CORONA discussed germination rates for the subject seeds at any point during the purchase / sale process. (UMF No. 11). The bags were affixed with labels (by CRITES) that testing in November 2015 indicated germination of 87%. (UMF No. 3).

The invoice for the sale of the subject seeds contained the following language: "NOTICE TO BUYER-PLEASE READ BEFORE PLANTING GUARANTEE AND EXPLANATION OF GUARANTEES; LIMITATION OF DAMAGES

Corona Seeds, Inc. warrants that seeds are labeled as required by law and within the tolerances set forth on the label. CORONA SEEDS AND ITS SUPPLIERS MAKE NO OTHER EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. The recommendations for the use of these products are based on the best recommendation and judgment of the personnel of Corona Seeds and its suppliers, without having any guarantee of results obtained in relation to these varieties. The Buyer guarantees that he / she is a farmer of a nursery with experience in the use of seeds. The new varieties must be tested to see their adaptability before commercial use. The descriptions and pictures of advertising will be used only as a guide and do not constitute any guarantee.

LIMITATION OF LIABILITY: The exclusive remedy for losses or damages for breach of the previous warranty or for negligence or otherwise, is limited to the purchase price of the seed and will not include the consequential damages. Claims for defects in this product must be submitted to Corona Seeds as soon as possible to allow Corona Seeds to investigate the complaint and, within 30 days after discovery. If the seed is transferred to a third party, a warning similar to this will be obtained, and Corona Seeds will be free of damages and will be compensated for damages caused by this transfer.

DISEASES: Some plant diseases are transmitted by seeds. Unless otherwise indicated in writing, no seeds have been tested for diseases transmitted by seeds. The test can be done at the request of the buyer at an additional cost."  (UMF No. 12).

It should be noted the bag contains the same language.  (UMF No. 13).  In addition, a label affixed to the bag states the following:

"WARRANTY AND DISCLAIMER OF WARRANTIES: Seller warrants that this product has been labeled as required by law and that it conforms to the label description, SELLER MAKES NO OTHER EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. Any recommendations for the use of this product or materials or apparatus in connection therewith are based upon Seller's best judgment but there is no warranty of results to be obtained in connection therewith. LIMITATION OF LIABILITY: The exclusive remedy for loss or damage due to breach of the foregoing warranty or contract or for negligence or other cause shall be limited to return of purchase price of this product and shall not include consequential damages. Claims for defects in this product must be presented to Seller as soon as practicable to enable Seller to investigate and in any event within thirty days after discovery."  (UMF No. 14).

AVSA does not dispute the terms of the provisionS above. The invoice was signed by a person with authority to enter into such contracts at AVSA. (UMF No. 15).  Once the seeds arrived in Peru, they go into quarantine with a government agency entitled SENASA.  The seeds were released by SENASA to AVSA after it cleared quarantine.  (UMF No. 15).  AVSA did not perform a germination test prior to planting the seeds.  AVSA did not test the seeds for disease prior to planting.  AVSA did not test-plant the seeds.  (UMF No. 16).

Sometime after planting, AVSA contends germination-related issues arose. AVSA performed in-house germination testing on certain Sapphire seeds in Lot C242606. (UMF No. 17). On May 25, 2016, AVSA advised CORONA of issues with germination. (UMF No. 18). CORONA sent samples of C242606 to an independent laboratory for testing. (UMF No. 19). CORONA also advised CRITES of the germination issue. AVSA attempted to find replacement Sapphire seeds but was unable to. (UMF No. 20). To account for lowered germination, CORONA recommended planting the Sapphire seeds at a 3-to-1 ratio. CORONA did so after discussing with CRITES. (UMF No. 21).

Importantly, the only issue CORONA was made aware of at that time was germination and nothing else. (UMF No. 22). CORONA was able to secure replacement Sapphire seeds of a different lot from CRITES and these replacement Sapphire seeds were sent to AVSA on May 26, 2016, arriving in Peru on June 10, 2016. (UMF No. 23). In sending the replacement seeds, CORONA entered into an agreement with AVSA, wherein if testing of the subject seeds exceeded 85%, then AVSA would agree to pay for the replacement seeds. (UMF No. 24). Ultimately, CORONA did not charge AVSA for the replacement seeds. (UMF No. 25).

### E. CUYUMA

CUYUMA is a commercial grower and exporter of agricultural produce in Peru. (UMF No. 26). CUYUMA placed an order for certain seeds, including Sapphire seeds from lot C242606, with CORONA in March 2016. The purchase price of the seeds was $20,515. The seeds were shipped by ocean freight on March 25, 2016. (UMF No. 27). No one from CUYUMA or CORONA discussed germination rates for the subject seeds at any point during the purchase / sale process. (UMF No. 28). The bags were affixed with labels (by CRITES) that testing in November 2015 indicated germination of 87%. (UMF No. 3). The invoice contained the following language:

"NOTICE OF DISCLAIMER OF WARRANTY, LIMITATION OF DAMAGES & INDEMNITY: Seller and its vendors disclaim any warranty whether express or implied of MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE,

8

OF WARRANTY BY SAMPLE.  Damages shall be exclusively LIMITED TO THE PURCHASE PRICE of the seed. If seed is transferred to another party Buyer shall indemnify, defend and hold Seller harmless from any claims. DISEASES: Many diseases are seedborne. Unless specifically stated, no seed has been tested for disease. Testing is available for additional charge." (UMF No. 29).

However, it should be noted that the bags and label contain the same language indicated in UMF No. 12. CUYUMA does not dispute the terms of the provision above. The invoice was signed by a person with authority to enter into such contracts at CUYUMA. (UMF No. 30).  CORONA advised CUYUMA of the germination issues, as CORONA had received the results of testing prompted by AVSA's communication regarding germination issues.  (UMF No. 31).  As the only issue known to CORONA at that time was germination-related, and there were no available replacement seeds, CORONA recommended planting at a 3-to-1 ratio to account for the lower germination rates. (UMF No. 32).  CORONA sent replacement seeds to CUYUMA free of charge. (UMF No. 33).

## F.        Disease Allegations

PLAINTIFFS contend in their TAC that test results from SENASA indicated the presence of a fungi called Stemphylium Sarciniforme on the fruits, and not the seeds, of Lot C242606 on November 8, 2016.  Thus, by their own admission, any potential notice of disease, to the extent Stemphylium Sarciniforme is a disease, could not have been any earlier than November 8, 2016.  (UMF No. 34).  PLAINTIFFS also refer to a test performed by SGS, which identified the presence of four types of fungi (Pantoea sp., Enterobacteriacese, Erwinia sp., and Acinetobacter sp.) and bacteria (Stemphylium sp., Alternaria sp., Cladosporium sp., Fusarium oxysporum, Sclerotinia sp., Cryptococcus victoriae, Thanalephorus cucumeris, and Pythium sp.).  (UMF No. 35).  PLAINTIFFS also refer to two tests performed by a Dr. Luz Leonor Mattos Calderon on samples of the subject Sapphire Seeds (at the behest of AVSA & CUYUMA), which purportedly revealed the presence of a bacteria called Pseudomonas syringae pv. psi.  (UMF No. 36).

With respect to the Stemphylium Sarciniforme, this is a "mold" type of fungus that commonly grows on dead organic matter and can be spread via spores in the air. While this fungus can be a contaminant on the outside surfaces of large sized seeds, such as pea seeds, it *does not* infect the pea and does not cause any problems to pea seeds. This fungus can grow as a secondary colonizer on plant tissues damaged by factors such as weather extremes, insect feeding, senescence and decline of the plant, high salts and other field problems, and damage caused by production practices. Stemphylium sarciniforme is common around the world, including Peru.  Importantly, Stemphylium sarciniforme is *not pathogenic* to peas. (UMF No. 37).

SGS-Portugal performed testing on seeds from the subject lot in April 2017.  The testing methodology used was "next generation sequencing," or "NGS." The NGS test consists of a high-level DNA analysis of the object tested.  However, NGS testing does not provide any information on whether the DNA is alive or dead. The presence of a particular fungus or bacterium, which was killed or otherwise died prior to planting, can and will show up in an NGS test.  In short, there is no way to discern between "dead" DNA versus "live" DNA.  Since NGS is only detecting DNA, the test does not indicate if the actual fungus or bacterium was even present.  (UMF No. 38).

Here, none of the detected bacteria in the SGS-Portugal test are pathogenic to peas. In fact, all bacteria identified in the test are all around us, found in soil, hands, dust, etc. As for three of the fungi identified, Stemphylium sp., Alternaria sp., and Cladosporium sp., these are common mold and not pathogenic to peas.  Cryptococcus victoriae is a yeast that is not pathogenic to peas.  As for Fusarium oxysporum, only one (1) strain out of hundreds is pathogenic to peas – the test provides no information on the specific strain. Fusarium oxysporum is also a soil-borne fungi.  Sclerotina sp. is also a soil-borne fungi and only species outs of hundred are pathogenic.  The testing did not reveal the specific species.  Thanatephorus cucumeris and Pythium can be pathogenic to peas but both are soil-borne. Notably, soil-borne fungi are pathogenic only if the contact is through soil.

The presence of soil-borne fungi on seeds generally suggests that the fungi is dead or inactive.  As indicated above, NGS testing does not identify whether any of the bacteria or fungus were alive – it merely identifies it was present at some point in time.  (UMF No. 39).

As for the phytopathological testing performed by Dr. Calderon, it should be noted at the outset that no fungi that is pathogenic to peas was detected.  With respect to the bacteria found, the testing methodology used does not conform to international standards. The method used by Dr. Calderon is likely to lead to misleading results. The method Dr. Calderon used does not permit the recovery and isolation of bacteria. Similarly, injecting the bacteria into other plants is inappropriate because it actually increases the likelihood of soft rot bacteria and soft rot bacteria species. Ultimately, the presence *Pseudomonas syringae pv. psi* was detected was faulty.  (UMF No. 40).

## 4. <u>LEGAL STANDARD</u>

Rule 56(c) mandates the entry of summary judgment… against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 322. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 249. The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" which would entitle the moving party to a judgment as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to a judgment as a matter of law. *Id.* at 324-26. This

evidence must consist of more than mere conclusory allegations. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

**5. <u>CORONA IS ENTITLED TO SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT</u>**

    **A.        CORONA Did Not Make Any Express Warranties**

Under California law, a seller creates an express warranty if it makes "[a]ny affirmation of fact or promise… to the buyer which relates to the goods and becomes a part of the basis of the bargain." *Cal. Commercial Code ("CCC")* ¶ 1213; *Weinstat v. Dentsply Int'l, Inc.* (2010) 180 Cal.App.4th 1213, 1218. However, *CCC* § 2316 permits parties to exclude or modify warranties. AVSA alleges in their complaint that CORONA orally affirmed that the subject seeds had a germination rate of 87% and that the label affixed by CRITES indicating the results of the Eurofins test was part of the bargain between AVSA and CORONA. (TAC ¶ 73-75). CUYUMA makes the same allegations. (TAC ¶ 163-165).

The evidence is undisputed that no one from AVSA never spoke to anyone from CORONA regarding germination rates as part of the sale. (UMF No. 9). Similarly, there is no dispute that no one from CUYUMA spoke to anyone from CORONA regarding germination as part of the sale. (UMF No. 28). In fact, AVSA admits that the first time it ever communicated any germination-related issues was May 25, 2016. (UMF No. 18). Similarly, CORONA voluntarily advised CUYUMA of the germination related issues in June 2016. (UMF No. 31). Thus, there is no credible basis for PLAINTIFFS' claim that CORONA ever represented any germination numbers to PLAINTIFFS as par to of the sale of seeds.

As for PLAINTIFFS' claim that the label indicating 87% germination constitutes a basis of the bargain, this claim lacks merit. The label indicates that testing was done in November 2015 on samples taken from Lot C242606, and that testing indicated germination of 87% in a laboratory. The 87% figure is not indicative of actual

germination rates in the "real world" because germination is dependent on a multitude of factors.  (UMF No. 7). In addition, germination of the seeds tested in November 2015 was in fact 87%.  CORONA was not aware of, nor did it have any reason to believe, that the germination rate of Lot C242606 apparently decreased after it was treated with Thiram.  As indicated above, CRITES did not apprise CORONA of this information until *after* AVSA communicated germination issues to CORONA in late May 2016.

In addition, *CCC* § 2316 permits parties to exclude or modify warranties in connection with the sale of goods.  There should be no dispute that the invoices and bags disclaim express and implied warranties. (UMF No. 12).  Based on the instant facts, CORONA is allowed to disclaim warranties because 1) the parties never discussed germination as part of the sales of the subject seeds and 2) the 87% germination rate test result is solely intended to convey that the samples of seeds from Lot C242606 were tested in November 2015 and that the tested seeds had a germination rate of 87%.  The 87% germination does not convey or otherwise guarantee that the seeds will actually germinate at 87%.  Furthermore, CORONA was completely unaware of the diminished germination level because CRITES never communicated such information until late May 2016, well after the sale had completed. Thus, the disclaimer of express warranty limitation is valid.

## B.        The Limitation of Remedies Clause is Valid

California law permits contracting parties to limit available remedies, including consequential damages, in the event of breach or other liability. *Nat'l Rural Tele. Coop. v. DIRECTV, Inc.* (C.D. Cal 2003) 319 F.Supp.2d 1040, 1048.  In fact, contracting parties may limit recovery to repayment of the purchase price as the exclusive remedy.   *CCC* § 2719(1).  However, where circumstances cause an exclusive or limited remedy to fail of its essential purpose, a plaintiff may pursue all remedies available to him or her under *CCC* § 2719(2).  Nevertheless, the courts typically should not alter the bargained for risk until the breach of so fundamental that it causes a loss which is not part of that allocation.

*Milgard Tempering, Inc. v. Selas Corp. of Am.* (9th Cir. 1990) 902 F.2d 703, 709. In addition, limiting a buyer's recovery to the contract price is permissible in the seed trade. *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1533. A key consideration for whether the limitation of remedies provision is enforceable turns on whether enforcement would leave the PLAINTIFFS with any remedy. A corollary to that general principle is that limitation of remedies fails of its essential purpose if the defect is "latent and not discoverable on reasonable inspection." *Marr Enters, Inc. v. Lewis Refrigeration* (9th Cir. 1977) 556 F.2d 951, 955.

In this instance, enforcement of the limitation of remedy provides PLAINTIFFS with the remedy of the purchase price of the seed. Here, PLAINTIFFS were sent replacement seeds at no charge. (UMF No. 25). In other words, PLAINTIFFS obtained the benefit of the limitation of liability clause yet now seek to disaffirm. In addition, the germination rate cannot be considered a latent defect. There is no reason why PLAINTIFFS, commercial growers and exporters, could not have tested the seeds for germination prior to planting. This is especially true in light of the fact that AVSA did in fact perform in-house germination testing after planting. Similarly, there is no reason why PLAINTIFFS could not have test-planted the subject seeds before wholesale planting – especially in light of the fact PLAINTIFFS knew the Sapphire seeds were a new variety. Notably, language in the invoice indicate that the "Buyer guarantees that he / she is a farmer… with experience in the use of seeds. The new varieties must be tested to see their adaptability before commercial use." (UMF No.12). Thus, the limitation of liability clause are enforceable.

### C.     CORONA Made No Implied Warranties

It is undisputed that the purchase agreements and labels for the subject seeds states that CORONA makes no other express or implied warranty of merchantability, fitness for particular purpose or otherwise. The implied warranty disclaimers at issue are conspicuous under the California Commercial Code. In fact, this Court indicated as such

in its ruling on CORONA's motion to dismiss (Page 19).  The Court ultimately denied the MTD because it had to accept as true PLAINTIFFS' claim that CORONA intentionally or negligently misrepresented the germination rate of the seeds at that stage in the pleading.

Now, the evidence is undisputed that the parties never discussed germination as part of the sale.  (UMF No. 11).  The evidence is also undisputed that CORONA had no way of knowing that post-sale germination testing by CRITES revealed lowered germination rates.  As indicated above, CRITES did not divulge this information to CORONA until after AVSA advised of germination-related issues in late May 2016.  As CORONA had no way of knowing the germination rates had dropped, it could not have intentionally or negligently misrepresented the germination rate to PLAINTIFFS.

As for PLAINTIFFS' argument that CORONA's recommendation of planting 3-to-1 (i.e. planting heavy) amounts to intentional or negligent misrepresentation, any such claims lack merit. As noted above, the only information available to CORONA at the time it made the recommendation was that the germination rates were low.  (UMF Nos. 22).  In addition, there were no replacement Sapphire seeds available at that time. Therefore, planting heavy was the only way to compensate for lowered germination rates. Furthermore, PLAINTIFFS were aware of the germination issues when they ultimately decided to plant heavy.  As PLAINTIFFS were aware of the germination issues, there is not credible basis for the claim that CORONA negligently or intentionally misrepresented the germination rate to PLAINTIFFS.

### D.       Plaintiffs Cannot Maintain Their Breach of Contract Claims

The contracts entered into between PLAINTIFFS and CORONA called for the sale of seeds, including Sapphire seeds from Lot C242606. The seeds were sold in conformity with the terms of the invoices.  Samples from Lot C242606 were tested by Eurofins and the results indicated germination of 87% - which is not disputed. The label conforms to the Federal Seed Act and California Seed Law (assuming both acts apply solely for

15

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

purposes of this Motion).  Specifically, both the FSA and CSL require the seller to provide information regarding the seeds on a label.  The label contained all such information.  While issues arose after the seeds were treated with Thiram, CORONA was not made aware of these issues and had no way of knowing about the lowered germination rate.  Again, CRITES did not apprise CORONA of that fact until after germination problems arose.  (UMF No. 6).  It is also important to note that neither the FSA nor CSL require that the seeds actually germinate at that actual percentage – it merely requires that identifying information be provided in conformance with the statutes.

Because the parties never discussed germination during the sale, the 87% germination test result and label were both accurate and conformed with the FSA and CSL, and CORONA had no way of knowing the germination rate dropped post-Thiram treatment, CORONA did not breach the contracts it entered into with PLAINTIFFS.

### E.    Plaintiffs' Cannot Maintain Their Negligent Misrepresentation Claim

Negligent misrepresentation requires a plaintiff to prove that a defendant made false statements, while honestly believing such statements to be true, had no reasonable ground for such belief, that such statement harmed plaintiff and that defendant's representation was a substantial factor in causing the harm suffered. *California Civil Code* Sec. 1710; *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407-408. PLAINTIFFS allege that the 87% germination rate on the label was a misrepresentation and that CORONA's recommendation of planting at a ratio of 3-to-1 was a misrepresentation of the quality of the seed.  PLAINTIFFS' claims lack merit.

Here, CORONA had every reasonable ground to believe that the germination test of 87% was accurate.  The test was performed was an independent laboratory and there was no reason for CORONA to believe that the test was inaccurate or improperly performed. Again, CRITES did not advise CORONA of the drop in germination post-

16

Thiram treatment.  CORONA'S first notice of any germination issues was in late May 2016, when AVSA informed CORONA of such. (UMF No. 18).  With respect to the 3-to-1 planting claim, this allegation makes little sense because the only issue known to the parties at that time was low germination.  As replacement seeds could not be obtained in time, planting at a heavier ratio would appear to counter-act low germination.  In addition, as the germination figures was known to all after May 2016, and the 3-to-1 recommendation was made after that time, PLAINTIFFS cannot claim reasonable reliance as they already knew of the lowered germination numbers. Notably, CORONA contacted CUYUMA to let them know of the germination issues.  (UMF No. 31). Accordingly, PLAINTIFFS cannot maintain their negligent misrepresentation cause of action.

### F.        PLAINTIFFS Cannot Maintain Their Negligence Cause of Action

Negligence consists of duty, breach, proximate cause and damages.  *Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.  Generally, the most important factor in assessing duty is foreseeability of harm.  *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143.  Other factors were set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 112, as follows: the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.  In addition to the *Rowland* factors, the process of cultivating a plant from seedling to plant is a difficult process that is often undermined by a multitude of factors outside a seed seller's control.

Here, the test performed by Eurofins indicated a germination rate on the samples to be 87%.  There is no reason for CORONA to doubt or otherwise this number.  However, it was not foreseeable to CORONA that the application of Thiram would somehow

decrease the germination rate of the seed.  It is also not foreseeable to CORONA that CRITES inexplicably failed to communicate the decreased germination.  Similarly, because germination relies on a host of factors outside CORONA's control, the type of harm alleged by PLAINTIFFS is simply not foreseeable.  Thus, it is not foreseeable that the 3-to-1 recommendation could have possibly caused any harm.  Notably, CORONA was not advised of any potential issue involving disease until at least after November 2016.  Similarly, the tests PLAINTIFFS are relying on simply do not support their claims.  As discussed at length above, the bacteria / fungi are either non-pathogenic to peas, or there is no evidence that any such organisms were alive.  In addition, PLAINTIFFS' testing methodology did not comply with international testing standards.

With respect to the remaining *Rowland* factors, while PLAINTIFFS allege they suffered injury, there is no demonstrable evidence demonstrating the closeness of CORONA's conduct to the harm suffered.  In addition, there is no moral blame to CORONA's conduct as CORONA had no reason to doubt the germination test and was not apprised of the post-treatment developments until much later. The policy of preventing future harm should not fall on CORONA's shoulders under these circumstances.  It would also create a significant burden to CORONA if it was forced to guarantee that seeds actually germinate at the rate tested because it would completely absolve a plaintiff of any responsibility.  As indicated above, cultivating a plant depends on a multitude of factors that are entirely outside a seed seller's control.  With respect to insurance, CORONA anticipates that growers can purchase insurance to insure against potential losses.

///

///

///

///

///

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

**6. <u>CONCLUSION</u>**

     For the foregoing reasons, CORONA respectfully requests that this Court grant its motion for summary judgment, or alternatively, partial summary judgment.

DATED:  November 13, 2019        HORTON, OBERRECHT, KIRKPATRICK & MARTHA

By: _____
       Cheryl A. Kirkpatrick
       Peter C.L. Chen
       Attorneys for Corona Seeds, Inc.

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is:  HORTON, OBERRECHT, KIRKPATRICK & MARTHA, 3 Park Plaza, Suite 350, Irvine, California 92614.

On November 15, 2019, I served the foregoing document described as:  **Corona Seeds, Inc.'s Motion for Summary Judgment, or Alternatively, Partial Summary Judgment,** on all interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as stated on the attached service list:

[ ]    **BY MAIL** – I deposited such envelope in the mail at Irvine, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited   with the U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than (1) day after the date of deposit for mailing in affidavit.

[ X ]   **BY ELECTRONIC TRANSMISSION** – I transmitted a PDF version of this document by electronic mail to the party(s) identified on the attached service list using the e-mail address(es) indicated.

[ ]    **BY OVERNIGHT DELIVERY** – I deposited such envelope for collection and delivery by Federal Express with delivery fees paid or provided for in accordance with ordinary business practices.  I am "readily familiar" with the firm's practice of collection and processing packages  for overnight delivery by Federal Express.  They are deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business.

[ X ]   (Federal)      I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 15, 2019, at Irvine, California.

_____
Crystal Thompson

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

## SERVICE LIST

Agricola Cuyuma SA v. Corona Seeds, Inc., et al.
United States District Court Central District of California: 2:17-cv-8220 DMG (SKx)

| | |
|---|---|
| Panda Kroll, Esq.<br>Law Offices of Panda Kroll<br>5999-B Ridgeview Street<br>Camarillo, CA 93012<br>Phone: (805) 764-0315; Fax: (805) 764-0339<br>Email: pkroll@pandakrollesq.com | Co-Counsel for Defendant Corona Seeds, Inc. |
| Bruce Alan Finck, Esq.<br>BENTON, ORR, DUVAL &<br>BUCKINGHAM<br>39 N. California Street<br>Ventura, CA 93001<br>Phone: (805) 648-5111; Fax: (805) 648-7218<br>Email: bfinck@bentonorr.com | Counsel for Defendant Corona Seeds, Inc. |
| Brian Nomi, Esq.<br>Law Office of Brian Nomi<br>215 E. Daily Drive, Suite 28<br>Camarillo, CA 93010<br>Phone: (805) 444-5960<br>Fax: (805) 357-5333<br>Email: briannomi@yahoo.com | Co-Counsel for Plaintiffs Agricola Cuyuma SA and Corporacion Agricola Vinasol S.A.C. |
| Eduardo Ayala Maura, Esq.<br>Ayala Law P.A.<br>1390 Brickell Avenue, Suite 335<br>Miami, FL 33131<br>Phone: (305) 570-2208<br>Fax: (305) 305-7206<br>Email: eayala@ayalalawpa.com | Co-Counsel for Plaintiffs Agricola Cuyuma SA and Corporacion Agricola Vinasol S.A.C. |
| Dale Dorfmeier, Esq.<br>PETRIE, LEATH, LARRIVEE &<br>O'ROURKE, LLP<br>6051 N. Fresno Street, Suite 110<br>Fresno, CA 93710<br>Tel: (559) 498-6522<br>Email: ddorfmeier@pllolegal.com | Counsel for Crites Seed, Inc. |

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

CORONA SEEDS, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JDGUMENT AGAINST PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56