1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AGRICOLA CUYUMA SA, et al., | ) Case No. CV 17-8220-DMG (SKx) |
| Plaintiffs, | ) **ORDER RE DEFENDANT CORONA** |
| | ) **SEEDS, INC.'S MOTION FOR** |
| v. | ) **SUMMARY JUDGMENT [76]** |
| CORONA SEEDS, INC., et al., | ) |
| Defendants. | ) |
| | ) |

This matter is before the Court on Defendant Corona Seeds, Inc.'s Motion for Summary Judgment ("MSJ"). [Doc. # 79.] The MSJ is now fully briefed. [Doc. ## 78 ("Opp."), 79 ("Reply").] For the following reasons, the Court **GRANTS in part** and **DENIES in part** the MSJ.

## I.

## PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs Agricola Cuyuma SA ("Cuyuma") and Corporacion Agricola Vinasol SAC ("AVSA") are Peruvian agriculture companies that produce various crops. *See* MTD Order at 1 [Doc. # 31]; SUF 8.[1] Corona is a California seed grower and distributor owned

---

[1] References to "SUF" are to Corona's Reply to Plaintiffs' Disputed Facts [Doc. # 79-2], which includes Corona's statement of undisputed facts, Plaintiffs' responses thereto, and Corona's replies.

by Mike Newman. *Id.* Defendant Crites Seeds, Inc. is a seed supplier that provided Corona the seeds at issue in this action. SUF 1.[2]

Crites planted the seeds that it supplied to Corona—a type of snap pea seed known as Sapphire seeds—in 2012 in a lot numbered C242606. Chen Decl., Ex. D at CRITES00002 [Doc. # 76-4]. Crites then tested those seeds' germination rates several times over the next few years. Tests in August 2012, February 2015, and March 2015—all conducted before Crites treated the seeds with a fungicide called Thiram—indicated that the seeds germinated at rates of 83%, 87%, and 82%, respectively. Maura Decl., Ex. A [Doc. # 78-3]. On November 25, 2015 a third-party testing laboratory called Eurofins also conducted a pre-Thiram-treatment test that indicated that a sample of the seeds germinated at a rate of 87%. *See id.*

**A.   AVSA-Corona Deal**

By January 2016, AVSA had secured several contracts for the sale of peas and began negotiations with Corona towards a purchase of Sapphire seeds. Maldonado Decl. at ¶¶ 4-7 [Doc. # 78-4]. AVSA ultimately placed an order that included Sapphire seeds from Lot C242606. SUF 9. The Sapphire seeds represented a large majority of the peas that AVSA had contracted to sell that year. MTD Order at 2.

Corona then arranged to acquire the seeds from Crites. Crites placed the seeds in bags that Corona supplied, treated the seeds with Thiram, and sealed the bags. SUF 1, 4. Crites then affixed a label to the bags indicating that, per the November 25, 2015 test, the seeds germinated at a rate of 87%, and sent the bags to Corona. SUF 2.

After shipping the seeds to Corona, Crites performed additional testing on a "retained sample" of the Thiram-treated seeds. SUF 5. That test, performed on March 9, 2016, indicated that germination rates had fallen to 75%. Maura Decl., Ex. A; SUF 5.

---

[2] The Court notes that Plaintiffs have repeatedly attempted to "dispute" Corona's statements of uncontroverted facts by providing additional facts and argument that do not actually controvert Corona's stated fact. The Court will not address each of these instances, but will instead only identify those facts that the parties in fact dispute.

Crites did not communicate this decrease in germination rate to Corona until months later. SUF 6.

Corona shipped the seeds to AVSA later in March 2016.  The invoice for the seed sale included the following language:

> NOTICE TO BUYER PLEASE READ BEFORE PLANTING GUARANTEE AND EXPLANATION OF GUARANTEES; LIMITATION OF DAMAGES Corona Seeds, Inc. warrants that seeds are labeled as required by law and within the tolerances set forth on the label.  CORONA SEEDS AND ITS SUPPLIERS MAKE NO OTHER EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  The recommendations for the use of these products are based on the best recommendation and judgment of the personnel of Corona Seeds and its suppliers, without having any guarantee of results obtained in relation to these varieties.  The Buyer guarantees that he / she is a farmer of a nursery with experience in the use of seeds.  The new varieties must be tested to see their adaptability before commercial use.  The descriptions and pictures of advertising will be used only as a guide and do not constitute any guarantee.
>
> LIMITATION OF LIABILITY: The exclusive remedy for losses or damages for breach of the previous warranty or for negligence or otherwise, is limited to the purchase price of the seed and will not include the consequential damages.  Claims for defects in this product must be submitted to Corona Seeds as soon as possible to allow Corona Seeds to investigate the complaint and, within 30 days after discovery.  If the seed is transferred to a third party, a warning similar to this will be obtained, and Corona Seeds will be free of damages and will be compensated for damages caused by this transfer.

DISEASES: Some plant diseases are transmitted by seeds. Unless otherwise indicated in writing, no seeds have been tested for diseases transmitted by seeds. The test can be done at the request of the buyer at an additional cost.

SUF 12. The bag containing the seeds included the same language and also included the following:

WARRANTY AND DISCLAIMER OF WARRANTIES: Seller warrants that this product has been labeled as required by law and that it conforms to the label description, SELLER MAKES NO OTHER EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. Any recommendations for the use of this product or materials or apparatus in connection therewith are based upon Seller's best judgment but there is no warranty of results to be obtained in connection therewith.

SUF 14.

Because the Peruvian government temporarily quarantines imported seeds as a safety precaution, the seeds did not reach AVSA until April 2016. SUF 16. AVSA did not "perform a germination test prior to planting the seeds" in May 2016. SUF 17. Nor did it "test-plant" the seeds or "test the seeds for disease prior to planting." *Id.* Shortly after planting the seeds, AVSA discovered significant problems with the seeds and performed "in-house germination testing." SUF 18. Those tests indicated that the seeds germinated at a "less than 50%" rate. Chen Decl., Ex. I at 2. After determining that the seeds were defective, AVSA attempted to find replacement seeds, but "was unable to do so." SUF 21.[3]

---

[3] Thereafter, Corona and AVSA each continued to test the seeds. Corona sent seed samples from Lot C242606 to Ransom Laboratories, which determined on June 9, 2016 that the seeds germinated at a rate of 62%. Maura Decl. Ex. A. AVSA obtained a test result on the same date from the seed laboratory at the La Molina National Agrarian University in Peru that indicated a 49% germination rate. Maura Decl., Ex. B. The tests also indicated the presence of several fungi and bacteria. *See id.* Further tests on seeds from lot C242606 treated with Thiram obtained by Corona reflected a germination rate ranging from

Around the same time, AVSA communicated the germination problems to Corona and sought Corona's advice for how to proceed. *See id.*; SUF 19.   Corona consulted with Crites before recommending that AVSA "plant heavy" (meaning plant more seeds at a higher concentration).[4]  SUF 22.  Newman's rationale behind this recommendation was that AVSA could plant a greater percentage of the original seed shipment to compensate for the decreased germination while Corona made efforts to "get more seed to ship" so that AVSA "would have enough seed to continue [its] plantings."   Chen Decl., Ex. A ("Newman Depo.") at 91:19-92:22.  At this point, it appears undisputed that Corona was aware of the seeds' decreased germination rates, but unaware of the presence in the seeds of any plant fungi or bacteria.  SUF 23.

Corona eventually secured from Crites replacement seeds from a different lot and sent those seeds free of charge to AVSA on May 26, 2019.  They arrived in Peru on June 10, 2016, but, due to the Peruvian quarantine protocols, AVSA could not plant the seeds until late July 2016.  SUF 24.

**B.    Cuyuma-Corona Deal**

Cuyuma also had entered into several contracts for the sale of peas by January 2016. Cuyuma representatives also met with Corona personnel and, like AVSA, decided to buy a large quantity of Sapphire peas.  SUF 28.  Once again, Corona obtained the seeds from Crites, which treated the seeds with Thiram, bagged them, sealed the bags, and placed on the bags a label indicating an 87% germination rate based on the November 25, 2015 test. SUF 3.  The invoice memorializing the deal and the bags shipped to Cuyuma included the same language set forth above.  *See* SUF 30.  Corona shipped the seeds in late March 2016. SUF 28.

---

50% to 74%.  See Maura Decl. Ex. A.  Further test results obtained by AVSA reflected germination rates between 29% and 44%.  See Maura Decl. Ex. B.

[4] The parties dispute the content and significance of Corona's consultation with Crites before making this recommendation.  The Court discusses these events further below.

After Cuyuma planted the seeds, and after Corona learned of the germination problems in the seeds that it shipped to AVSA, Corona informed Cuyuma that recent testing indicated that the seeds germinated at a rate of 62%. Maura Decl., Ex. H. Newman recommended to Cuyuma personnel on June 9, 2016 that Cuyuma plant its seeds heavy to compensate for the lower germination. *Id.* Cuyuma followed his recommendation. Chen Decl., Ex. K ("Flores Depo.") at 45:6-46:11. It appears undisputed that, while Corona knew at this time about the germination issues, it was unaware of the presence of any bacteria or fungi in the seeds. SUF 33.

To corroborate its observation that other crops in Cuyuma's fields became contaminated after it planted the Sapphire seeds, Cuyuma ordered a series of tests. Those tests indicated that the seeds germinated at a rate of 34% and that they bore certain bacteria and fungi which may have spread to the land and other crops. Maura Decl., Ex. D. Around the same time, Corona sent Cuyuma replacement seeds from a different lot free of charge. SUF 34.

## C.   This Action

Plaintiffs filed this suit in November 2017 and filed the operative Third Amended Complaint ("TAC") on February 25, 2019. [Doc. ## 1 ("Complaint"), 52 ("TAC").] That pleading added Crites as a Defendant. *See* TAC. Corona filed the instant MSJ on November 15, 2019. *See* MSJ. Crites has not joined in the MSJ, so the Court's analysis pertains only to Plaintiffs' claims against Corona.

## II.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").  "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  "Rather, it draws all inferences in the light most favorable to the nonmoving party."  *Id.*

## III.

## DISCUSSION

Plaintiffs each bring claims against Corona for:  (1) breach of express warranty; (2) breach of implied warranty; (3) negligence; (4) negligent misrepresentation; and (5) breach of contract.  *See* TAC.  Corona moves for summary judgment or summary adjudication on each claim.  *See* MSJ at 1.

### A.    **Breach of Express Warranty**

The Court addressed Plaintiffs' claims for breach of express warranty in its MTD Order, but the arguments and facts relating to this dispute have changed since the date of that Order.  At the pleading stage, Plaintiffs alleged that Corona had "repeatedly told Plaintiffs that the [s]eeds had a germination rate of at least 87%."  MTD Order at 14 (internal quotations omitted).  At this point, however, it is uncontroverted that Plaintiffs and Corona did not expressly discuss the seeds' expected germination rates before they executed the purchase deal, though there is evidence that Corona did suggest that these

seeds had a better productivity and grew in more volume than another seed variety.  *See*
SUF 11; 29; Maldonado Decl. ¶¶ 10, 13.[5]  Additionally, Corona primarily argued in its
MTD that the disclaimer language in the parties' purchase contracts foreclosed any liability
for breaching any express warranty that Corona may have provided.  *See* MTD Order at
14.  Corona briefly resurrects that argument in its MSJ, but now mainly argues that any

---

[5] Plaintiffs dispute the fact that the parties did not discuss germination rates before executing the
purchase orders by submitting declarations from Edwin Maldonado, AVSA's field manager, and Angello
Flores, Cuyama's then-head of sales.  Flores and Maldonado state that Corona's representative, Leonel
Cruz, promised that Sapphire peas were "better performing" in many ways than other types of peas.  Flores
Decl. at ¶ 24; Maldonado Decl. at ¶ 9-12.  Flores and Maldonado both claim to have understood their
conversations with Cruz to mean that Sapphire peas had a high rate of germination, even if neither Flores
nor Maldonado expressly discussed germination rates with Cruz.  *See* Flores Decl. at ¶ 24; Maldonado
Decl. at ¶ 9-12.

Corona objects to nearly every word of these declarations on various grounds.  It also objects to
each declaration as a whole under the sham affidavit rule.  When a party has lodged a panoply of meritless
evidentiary objections, the Court need not state its rulings on all of them.  *See Stonefire Grill, Inc. v. FGF
Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013).  Many of the contentions in Corona's 81-
pages of evidentiary objections—such as the objection for lack of foundation to Flores' description of the
contents of a Corona promotional brochure even though the brochure is *attached to the declaration itself*—
are frivolous.  Accordingly, although the Court has taken the time to review Corona's objections, it will
not individually analyze them unless the Court must discuss them to reach its ruling.  All objections not
discussed are **OVERRULED**.

Similarly, Corona's objection to Flores' and Maldonado's declarations in their entireties reflects a
fundamental misunderstanding of the sham affidavit rule.  Corona simultaneously claims that the
declarations are shams because they contradict the deposition testimony of Oscar Alban as to whether
Corona ever discussed germination rates with Cuyama or AVSA *and* that the declarations do not conflict
with Alban's testimony because Flores and Maldonado never state that they *explicitly* discussed
germination rate with Cruz.  Setting aside that the declarations cannot both contradict and not contradict
Alban's testimony on this issue, even if the declarations *did* contradict the deposition testimony, Alban
(not Flores or Maldonado) gave that deposition.  *See* SUF 11 (referring to "Alban Depo.").  The sham
affidavit rule precludes an individual from giving contradictory testimony in a declaration and a deposition
for the purpose of creating a triable issue of fact at summary judgment.  *Yeager v. Bowlin*, 693 F.3d 1076,
1080 (9th Cir. 2012) ("The general rule in the Ninth Circuit is that *a party* cannot create an issue of fact
by an affidavit *contradicting his prior* deposition testimony") (emphasis added).  It does not preclude
*different* people from providing differing testimony.  Corona's objections to the declarations are
**OVERRULED**.

representations that it made to Plaintiffs regarding the seeds did not amount to express warranties about germination rates. MSJ at 12-13. Corona's arguments are unpersuasive.

As the Court stated in its MTD Order, a seller creates an express warranty by making "[a]ny affirmation of fact or promise . . . to the buyer which relates to the goods and becomes part of the basis of the bargain." Cal. Com. Code § 2313(1)(a); see *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1228 (2010) ("[S]ection 2313 focuses on the seller's behavior and obligation—his or her affirmations, promises, and descriptions of the goods—all of which help define what the seller 'in essence' agreed to sell."). California courts have held that the "basis of the bargain requirement . . . does not mean that a description by the Seller must have been *bargained for*. Instead, the description must go *to the essence of the contract*." *Weinstat*, 180 Cal. App. 4th at 1229.

Accordingly, even if Corona's pre-sale discussions and negotiations with AVSA and Cuyuma regarding the seeds did not include an express representation that the seeds would germinate at or around 87%, it is clear that the seeds' germination potential was essential to the contract. Indeed, both Flores and Maldonado have stated that no grower, including Cuyuma or AVSA, will purchase seeds with germination rates below 80% because those seeds would not be profitable. Flores Decl. at ¶ 25; Maldonado Decl. at ¶ 14. Therefore, the fact that Corona never had any explicit pre-sale discussions with AVSA or Cuyuma about germination rates does not, in and of itself, defeat Plaintiffs' claim for breach of express warranties.

Indeed, Plaintiffs' claim survives because the record shows that Corona made an "affirmation of fact" that the seeds would achieve a certain rate of germination in another manner: the labels affixed to the seed bags indicated that the seeds germinated at an 87% rate. Corona argues that the label itself only shows that the seeds germinated at that rate in laboratory conditions in November 2015—not that they would achieve a similar rate of germination at a later date in the "real world," where seeds face a "multitude of factors"

that affect growth.  MSJ at 12-13.  The label itself makes no such distinction and Corona provides no legal support for that argument.  *See* Chen Decl., Ex. B.

The only on-point California case appears to be the one that Plaintiffs have cited—*Weastern Soil Bacteria Co. v. O'Brien Bros.*, 49 Cal. App. 707 (1920).  That court rejected the argument that a seed seller should bear no liability for breaching a warranty merely because "there are other elements" beyond the seed seller's control "which enter into the problem as to whether seed . . . will germinate and grow to its expected maturity, such as conditions of soil and location and also the particular climatic conditions of the season of the planting and growth of said seed."  *Id.* at 710.[6]

Moreover, while California courts do not appear to have directly addressed the question of whether tags or labels bearing representations of germination rates constitute express warranties, other states' courts have done so.  In Louisiana, a "germination rate set out on the tag [is] an express warranty."  *Gauthier v. Bogard Seed Co.*, 377 So. 2d 1290, 1291 (La. Ct. App. 1979).  Arkansas courts agree.  *Walcott & Steele, Inc. v. Carpenter*, 246 Ark. 95, 99 (1969) ("We hold as a matter of law that the certification [on a label showing the percentage or germination] warrants the contents of the bag to be as stated thereon, within reasonable and recognized tolerances, and that it is a warranty made by that vendor

---

[6] Corona attempts to distinguish *Weastern Soil* because the court, in holding the seller to its warranty, reasoned that the seller had familiarity with the "soil and location" in which the seed was to be planted, whereas Corona has no similar familiarity with Plaintiffs' farms' conditions.  Reply at 9-10 (citing *Weastern Soil,* 49 Cal. App. at 710).  There is evidence in the record, however, that Corona *did* understand the "soil and location" in which the seeds at issue would be planted.  In an email to Crites' CEO, Andy Johnson, Newman states:

> I have not heard any reports that soil temperatures [in Peru are] lower than usual. . . . In general Peru temperatures January through May are the highest of the year this being their spring/summer season.  Pythium could be an issue except we have found in the past due to coastal Peru being a very dry area . . . such soil borne pathogens are rare compared to say Guatemala where there is heavy rain during the rainy season there.

Maura Decl., Ex. C.  Given that Corona apparently has familiarity with coastal Peru's soil and seasonal conditions, *Weastern Soil* is more analogous than Corona makes it out to be.

-10-

who causes the certification to be attached.").   And the Kansas Supreme Court has reasoned—persuasively, in this Court's view—that:

> certification as to the germinative qualities of agricultural seed speaks only as of the date of testing for germination, and upon sale a purchaser is entitled to rely upon the label as to germinative qualities, within normal limits of tolerance, as an express warranty from his vendor at the time of delivery only.  Such deterioration of germinative qualities as may occur after delivery of certified agricultural seed upon sale is the responsibility of the purchaser.  He is required to take the necessary steps to preserve the germinative qualities while such seed is in his possession and control. . . .  The burden of proof is therefore upon the purchaser to show that at the time he accepted delivery of certified agricultural seed it was not as expressly warranted on the label concerning its germination. It must be understood in labeling agricultural seed that any specific percentage figure with reference to germination is always subject to variation within normal limits of tolerance customarily recognized in the seed business.

*Anderson v. Thomas*, 184 Kan. 240, 261–62 (1959).[7]

Here, the label on the seeds that Corona shipped to AVSA and Cuyuma plainly stated that the seeds germinated at a rate of 87%.  SUF 3.  There is also substantial uncontroverted evidence in the record showing that, at the time AVSA and Cuyuma accepted delivery, the seeds were incapable of that rate of germination.  As discussed above, Crites' subsequent testing on retained samples indicated reduced germination rates, and both AVSA and Cuyuma reported defects in the seeds immediately upon planting them.  Moreover, there is no evidence in the record to suggest that AVSA or Cuyuma mishandled, misplanted, or

---

[7] Corona has not argued that the seeds' germination problems are the result of "variation within the normal limits of tolerance customarily recognized in the seed business."  Indeed, emails between Newman and Johnson reveal that Plaintiffs experienced abnormally low germination.  Maura Decl, Ex. C (email from Johnson stating that Plaintiffs' reported 41% growth rate is "terrible").

miscultivated the seeds in any manner.  Indeed, by Newman's own admission, AVSA has "been in the pea business for years so [it] does know what [it] is talking about."  Maura Decl., Ex. C.  Accordingly, the representation on the bags' labels that the seeds would germinate at an 87% rate is sufficient to give rise to an express warranty that the seeds would germinate at that rate (or within a normal variation of that rate).

Corona also argues that it should not be liable for breaching that warranty because it was "completely unaware of the diminished germination level because Crites never communicated such information until . . . after the sale [to Plaintiffs] had completed."  MSJ at 13.  Corona provides no legal support for the proposition that a seller's subjective lack of knowledge that its warranties are false absolves it of liability for breaching those warranties.  Indeed, California courts have long held the opposite.  *See Grinnell v. Charles Pfizer & Co.*, 274 Cal. App. 2d 424, 442 (1969) ("The obligation of a warranty is absolute, and is imposed as a matter of law irrespective of whether the seller knew or should have known of the falsity of his representations.").

Finally, Corona restates its pleading stage argument that language in its purchase contracts was sufficient to disclaim whatever express warranty it may have made.  But it once again provides no authority or persuasive reasoning demonstrating that the Court should depart from its previous ruling in the MTD Order that "Corona's disclaimer of its express warranty regarding the [s]eeds' 87% germination rate is unenforceable because the disclaimer is wholly inconsistent with that express warranty."  MTD Order at 14 (citing *Hauter v. Zogarts,* 14 Cal. 3d 104, 119 & n.18 (1975)).

In sum, Corona has not met its burden of showing that summary judgment is appropriate as to Plaintiffs' breach of express warranty claim.

**B.     Breach of Contract**

Plaintiffs' breach of contract claim is based on the same facts as their breach of express warranty claim.  Opp. at 20 (citing *Dagher v. Ford Motor Co.*, 238 Cal. App. 4th 905, 928 (2015) ("An express warranty is a contractual promise from the seller that the goods conform to the promise.") (internal quotations omitted)).  Corona's arguments for

summary judgment on this claim are convoluted and difficult to follow. Corona does not specify which element of a breach of contract claim it believes that Plaintiff has failed to meet,[8] but its arguments focus on the facts that (1) the label affixed to the bags that AVSA and Cuyuma received conformed "to the Federal Seed Act and California Seed Law" and (2) Corona was not aware of the decreased germination rates after the seeds were treated with Thiram until after it completed the sales to Plaintiffs. MSJ at 15-16. The labels' conformity with state and federal seed law requirements has no bearing on Plaintiffs' breach of contract claims. It is also unclear what effect Corona's lack of knowledge as to the seeds' treatment with Thiram has on any of the elements of Plaintiffs' breach of contract claim. Since Corona has not met its burden of showing the absence of a genuine issue of material fact on this subject, the Court **DENIES** its MSJ as to Plaintiffs' breach of contract claims. *See Catrett*, 477 U.S. at 323.

## C. Limitation of Remedies Clause

Plaintiffs seek two types of consequential damages arising out of the Sapphire seeds' defects: (1) damages arising out of the fact that the replacement seeds Corona sent arrived "so late to Peru that the sowing campaigns were severely affected" and (2) damages arising out of the seeds' contamination of Plaintiffs' fields and other crops. Opp. at 16. The parties do not dispute that the contract contains language that purports to limit the potential remedies that Plaintiffs may recover to only the purchase price of the Sapphire seeds. Corona argues that such language precludes Plaintiffs from recovering consequential damages. MSJ at 14.

As explained in the MTD Order, the California Commercial Code provides that, subject to certain limitations, contracting parties may agree to limit recovery to an exclusive remedy, such as repayment of the contract price. Cal. Com. Code § 2719(1). One of those limitations is that, where "circumstances cause an exclusive or limited remedy

---

[8] The well-established elements of a breach of contract claim are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

to fail of its essential purpose," a plaintiff may pursue all remedies otherwise provided in the Commercial Code. *Id.* at § 2719(2); *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 547 (9th Cir. 1985) ("[W]here parties agree to a limitation of damages provision, courts should not alter the bargained for risk allocation unless a breach of contract is so fundamental that it causes a loss which is not part of that allocation."); *accord Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 709 (9th Cir. 1990).

The Court has also already determined that a limitation of remedies fails of its essential purpose when defects in the goods are "latent and not discoverable on reasonable inspection."  MTD Order at 17; *Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir. 1977); *accord Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 646 (10th Cir. 1991).  Although the Court decided in its MTD Order that the "low germination rate of the [s]eeds is a latent defect that was non-discoverable by Plaintiffs upon reasonable inspection," MTD Order at 18, Corona argues that Plaintiff should have discovered the germination issues before planting because the purchase contract states that "[t]he Buyer guarantees that he/she is a farmer or nursery with experience in the use of seeds.  The new varieties must be tested to see their adaptability before commercial use." MSJ at 14.  Based on Corona's argument and explanation, however, it is unlikely that such a statement means, as a matter of law or undisputed fact, that a farmer in Plaintiffs' shoes would reasonably test the seeds for germination rates *despite* the warranty on the bags' labels.  Indeed, as Plaintiffs point out, in light of a seller's express warranty, a "buyer is justified in taking the seller at his word, and in relying upon the seller's statement rather than his own examination." *United States v. Franklin Steel Prod., Inc.*, 482 F.2d 400, 403 n.4 (9th Cir. 1973).

Corona also argues that Plaintiffs have already received the benefit of their bargain because Corona alleviated any injury by sending replacement seeds at no cost.  Such an attempt by Corona to make its clients whole is admirable, and it may serve to cure the direct harm that Plaintiffs suffered by spending money to purchase defective seeds.  But it does little, if anything, to cure the harm Plaintiffs suffered by having to alter their sowing

campaigns and reduce their crop output, thereby incurring extra expenses and reaping fewer profits from their contracts to sell the peas that they grew.  These injuries appear to comprise the bulk of Plaintiffs' complained-of harm.[9]  *See Nat'l Rural Tele. Coop.*, 319 F. Supp. 2d 1040, 1055 (C.D. Cal. 2003) (quoting *Computerized Radiological Servs., Inc. v. Syntex Corp.*, 595 F. Supp. 1495, 1510 (E.D.N.Y. 1984) *rev'd in part on other grounds*, 786 F.2d 72 (2d Cir. 1986)) ("A limited remedy fails its essential purpose when the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all.").  Corona's MSJ is therefore **DENIED** insofar as it seeks to limit Plaintiff's remedies to the purchase price of the seeds.

**D.    Breach of Implied Warranties and Negligent Misrepresentation**

Corona argues that its contract language was sufficient to disclaim any implied warranties of merchantability or fitness for a particular purpose.  MSJ at 14.  The Court has already determined that Corona's language *per se* was adequate to disclaim any implied warranties because, under the applicable standards for interpreting disclaimers of implied warranties, the language was in writing and conspicuous.  MTD Order at 18.  Nonetheless, the Court declined to dismiss Plaintiffs' breach of implied warranty claims because

---

[9] Injuries caused by the purported contamination of Plaintiffs' lands and other crops appear to be another large percentage of the complained-of harm.  Corona's arguments pertaining to the limitation of remedies, however, focus exclusively on the low germination rates.  This dissonance is emblematic of a larger problem in the parties' MSJ papers.  Each sides' submissions devote a significant amount of time to attacking the other side's science-based arguments regarding whether the seeds at issue carried harmful diseases and disputing the findings of the other side's plant pathology expert.  *See* MSJ at 9-11; Opp. at 8-10; Reply at 4-7.  But Corona does not make clear how these disputes affect the merits of its motion.  The evidence regarding crop-borne diseases is plainly pertinent to the extent of disease-related damages and may relate to the foreseeability of the damages in the negligence context, but whether, as a matter of scientific fact, the seeds carried harmful diseases (as opposed to whether and when Defendants were aware of that fact) does not appear to have any bearing on Corona's arguments for summary judgment on the merits of Plaintiffs' causes of action.  Indeed, Corona does not move for summary adjudication of the extent of Plaintiffs' consequential disease-related damages (other than by way of the contractual limitation language).  *See* MSJ.  Since Corona has not cogently explained how the parties' disease-related testimony supports its summary judgment arguments, the Court proceeds as if they do not.  *See* Fed. R. Civ. P. 7(b)(1)(b) ("A request for a court order must be made by motion.  The motion must:  . . . (B) state with particularity the grounds for seeking the order; and (C) state the relief sought.").

-15-

Plaintiffs adequately pled that the disclaimers, either directly or indirectly, sought to "exempt Corona for 'responsibility for its own fraud' under California law." *Id.* at 19 (citing Cal. Civ. Code § 1668).[10]  Because negligent misrepresentation qualifies as "fraud" under section 1668, the Court held that Corona's disclaimers "may be unenforceable" if Corona "intentionally or negligently misrepresented the germination rate of the [s]eeds to Plaintiffs' detriment." *Id.*  At this stage, therefore, the Court must first determine whether genuine issues of material fact remain as to whether Corona negligently misrepresented any information to Plaintiffs before determining whether Plaintiffs' implied warranties claim may survive.

### 1.    Negligent Misrepresentation

Plaintiffs contend that Corona negligently misrepresented that the seeds would germinate at a rate of 87% and that planting heavy would be an effective solution to the reduced germination problem.  Opp. at 23-24.  To demonstrate negligent misrepresentation, plaintiffs must show:  "(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Ragland v. U.S. Bank Nat'l Assn.*, 209 Cal. App. 4th 182, 196 (2012).

Corona challenges only the second element.  It argues that Plaintiffs' claim based on Corona's representation of the 87% germination rate must fail because Corona had a reasonable basis for believing that the seeds would germinate at that rate:  Crites' representation that the rate was accurate based on the November 2015 Eurofins test.  MSJ at 16.  Plaintiff argues that it was unreasonable for Corona to base its representation on that test because *another* test that Crites conducted before Corona shipped the seeds to Plaintiffs revealed that germination rates had fallen to 75%.  MSJ at 18-19.  But it is undisputed that

---

[10] Section 1668 states that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

Crites did not inform Corona of that test until *after* Corona sold and shipped the seeds to Plaintiffs.  In fact, Crites did not inform Corona of the subsequent test until after "AVSA communicated concerns with the seed[s'] germination in late May 2016" to Corona.  SUF 6.  Accordingly, Crites' representation to Corona that the seeds germinated at an 87% rate was a "reasonable ground" for Corona to believe that number to be accurate.

Plaintiffs also contend that Corona acted "recklessly" or "negligently" in failing to conduct its own test after seeing the label that Crites placed on the seed bags, but it cites no legal authority or evidence of industry best practices that require seed sellers to conduct their own independent testing, as opposed to relying on another company's testing, before making representations about a product.  Corona's decision to rely on Crites' testing as the basis for its germination-related representations to Plaintiffs does not rise to the level of reckless or negligent misrepresentation even if, with the benefit of perfect hindsight, Corona could have discovered the decrease in germination rates by testing the seeds themselves before shipping them to Plaintiffs.

Corona also reasonably believed that its recommendation that Plaintiffs mitigate the low germination rates by planting heavy was the best course of action.[11]  Reply at 13.  Plaintiffs argue that this recommendation, which they followed, led to the further proliferation of disease and contamination in their fields, causing more damage to crops, more expenses, and more lost profits.  They argue that, for two reasons, Corona had no reasonable grounds for believing that planting heavy would fix the low germination problem.  The first is that Johnson expressed concern in a May 31, 2016 email to Newman about planting heavy because "[i]f the seed is planted in cool soil with only Thiram it has

[11] The Court questions whether this recommendation is sufficient to satisfy the first element of negligent misrepresentation—the misrepresentation of a past or existing material fact.  Corona's advice to Plaintiffs about how to cure their germination problem is not obviously a representation of a past or existing fact.  It appears to be more like a prediction about the future, which generally does not qualify as an actionable misrepresentation.  *Cohen v. S & S Constr. Co.*, 151 Cal. App. 3d 941, 946 (1983) ("predictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud").  Since Corona makes no such argument, however, the Court need not examine the question further.

no Pythium suppression.  The disease can colonize quickly so if the seed sits in the ground too long there will be problems."  *See* Maura Decl., Ex. C.  Plaintiffs essentially argue that Corona recommended planting heavy despite Crites' advice to the contrary.  The second is that Cruz, Corona's representative, may have learned on May 25, 2016 that "there are only 7 plants per linear meter, as well as the presence of coriaceous leaves, lacking in vigor." Chen Decl., Ex. I at 3.

Plaintiffs' characterization of the Johnson emails is not entirely accurate.  While Johnson did raise the concern about Pythium colonizing quickly in cool soil, Newman responded that he understood that Plaintiffs' soil temperatures were no "lower than usual." Maura Decl., Ex. C.  After Newman provided Johnson with all the information he had, Johnson dismissed his concerns and ultimately recommended that Newman advise Plaintiffs to "gamble and plant heavy" while Defendants made arrangements to "settle" the parties' dispute "with free seed."  *Id.*  It is therefore incorrect to argue that Newman recommended planting heavy *despite* Crites' contrary recommendation.  To the contrary, it appears that both Defendants agreed that, under the circumstances, planting heavy was the best course of action.  Johnson's emails therefore are not evidence that Corona lacked reasonable grounds to recommend planting heavy.

Plaintiffs' argument pertaining to Cruz's alleged knowledge of a reduced number of "plants per lineal meter" and the seeds' reduced vigor and coriaceous leaves fails because Plaintiffs have not cited any evidence that a seed seller with such knowledge would know not to advise a client to plant seeds heavy under such circumstances.  Without any evidence demonstrating that Cruz's alleged knowledge would nullify any reasonable basis for Corona's recommendation to plant heavy, Plaintiffs have not shown the existence of a triable fact regarding their negligent misrepresentation claim.  The Court therefore **GRANTS** Corona's MSJ on that claim.

### 2.      Breach of Implied Warranties

Because Corona's disclaimers are in writing and conspicuous, as discussed above, Plaintiffs' breach of implied warranties claim can survive only if California Civil Code

section 1668 renders the disclaimers unenforceable as an impermissible exemption from responsibility for fraud. Since Plaintiffs have not shown that Corona bears any responsibility for fraud or negligent misrepresentation, however, their section 1668 argument is unavailing. The Court therefore **GRANTS** Corona's MSJ on Plaintiff's claim for breach of implied warranties.

**E.    Negligence**

The elements of negligence are, of course, "(a) a legal duty to use due care; (b) a breach of such legal duty; and (c) the breach as the proximate or legal cause of the resulting injury. *Ladd v. Cty. of San Mateo*, 12 Cal. 4th 913, 917 (1996) (internal brackets and quotations omitted). Corona focuses only on the duty requirement. MSJ at 17. It argues that it owed Plaintiffs no duty of care because the factors set forth in *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968), eliminate any such duty when applied to the specific facts of this case. *See* MSJ at 17-18 (arguing that events giving rise to this action were unforeseeable to Corona or Crites given the parties' communications, the particular chemicals used to treat the seeds at issue, and the specific types of bacteria and fungi purportedly found on the seeds).

Corona's use of *Rowland* to advocate for a case-specific carve-out from the duty of ordinary care is misguided. As the California Supreme Court has made clear,

> the *Rowland* factors are evaluated at a relatively broad level of factual generality. Thus, as to foreseeability, we have explained that the court's task in determining duty is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed. . . .  In applying the other *Rowland* factors, as well, we have asked not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire

category of cases from that general duty rule is justified by clear considerations of policy.

*Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 772 (2011). The *Rowland* analysis in this case, examined from the appropriate altitude, is not whether *Corona* owed *Plaintiffs* a duty based on *Crites'* representations to *Corona* (or lack thereof), *Corona's* subjective knowledge, *Corona's* recommendations to *Plaintiffs*, and the particular damages *Plaintiffs* suffered. Rather, the inquiry is whether obvious policy considerations justify exempting seed sellers from any duty to exercise ordinary care in selling seeds obtained from third-party seed suppliers to customers expecting a certain quality of seeds.

Corona has offered no justification for such broad exemption for seed sellers from the ordinary duty of care, and none is obvious to the Court. *See id*. at 1174 (citing *Rowland*, 69 Cal. 2d at 108) ("[I]n the absence of a statutory provision establishing an exception to the general [negligence duty], courts should create one only where *clearly supported by public policy*.") (brackets and emphasis added) (internal quotations omitted). Its MSJ is therefore **DENIED** as to Plaintiffs' negligence claim.[12]

## IV.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Corona's MSJ as to Plaintiffs' breach of implied warranties and negligent misrepresentation claims, and **DENIES** Corona's MSJ as to Plaintiffs' breach of express warranty, breach of contract, and negligence claims. The

---

[12] The Court reaches no ruling as to whether Corona has breached its general duty to Plaintiffs. For one thing, Corona makes no such argument here. For another, as the *Cabral* court reasoned, the "determination that the defendant owed the plaintiff no duty of ordinary care" is "for the *court* to make," and the "determination that the defendant did not breach the duty of ordinary care" is "for the *jury* to make." *Cabral*, 51 Cal. 4th at 772.

Court also **DENIES** Corona's MSJ to the extent it argues that the purchase contracts operate to limit Plaintiffs' remedies to the purchase price of the seeds.

**IT IS SO ORDERED.**

DATED:  December 20, 2019

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE