1   JASON F. MEYER  (SBN:  190800)
    jmeyer@grsm.com
2   J. TODD KONOLD  (SBN:  222616)
    tkonold@grsm.com
3   LISA G. TAYLOR  (SBN:  156381)
    ltaylor@grsm.com
4   GORDON REES SCULLY MANSUKHANI, LLP
    101 W. Broadway, Suite 2000
5   San Diego, CA 92101
    Telephone:  (619) 230-7767
6   Facsimile:  (619) 696-7124

7   Attorneys for Defendant
    CRITES SEED, INC.

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  Agricola Cuyuma SA; Corporacion      )   CASE NO. 2:17-cv-8220-DMG (SKx)
    Agricola Vinasol SAC;                )
13                                       )   **DEFENDANT CRITES SEED,**
                     Plaintiff,          )   **INC.'S TRIAL BRIEF**
14                                       )
            vs.                          )
15                                       )
    Corona Seeds, Inc., et al.           )   Trial Date: June 18, 2021
16                                       )
                     Defendants.         )   Judge: Hon. Dolly M. Gee
17                                       )
                                         )
18  _____

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

III.  LEGAL ISSUES ................................................................................................... 8

      A.    The Economic Loss Rule ......................................................................... 8

      B.    Plaintiffs' Comparative Fault ................................................................. 13

IV.   CONCLUSION.................................................................................................... 13

DEFENDANT CRITES SEED, INC'S TRIAL BRIEF          CASE NO. 2:17-cv-8220-DMG (SKx)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated FM Ins. Co. v. LTK Consulting Servs.*,
   (9th Cir. 2009) 556 F.3d 920...................................................................10, 11

*Agricola Baja Best v. Harris Moran Seed Co.*,
   (2014) 44 F.Supp.3d 974.......................................................................9, 10

*Daly v. General Motors Corporation*,
   (1978) 20 Cal.3d 725 .................................................................................13

*Gauba v. Florence Hosp., Ltd. Liab. Co.*,
   2013 U.S. Dist. LEXIS 86215 .....................................................................10

*Giles v. GMAC*,
   (2007) 494 F.3d 865 .....................................................................................8

*J'Aire Corp. v. Gregory*,
   (1979) 24 Cal.3d 799 ...................................................................................11

*Jimenez v. Superior Court*,
   (2002) 29 Cal.4th 473 ...............................................................................8, 9

*Neibarger v. Universal Cooperatives, Inc.*,
   (1992) 439 Mich. 512 [486 N.W.2d 612] .....................................................9

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
   (2004) 34 Cal.4th 979 ...............................................................................8, 9

*Southern California Gas Leak Cases*
   (2019) 7 Cal.5th 391 ....................................................................................11

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*,
   2015 WL 12746208 ......................................................................................10

*Wells v. Chase Home Fin. LLC*,
   2010 U.S. Dist. LEXIS 127854 ....................................................................10

Defendant Crites Seed, Inc., respectfully submits the following summary of relevant fact and law in advance of the trial set in the referenced matter.

## I.

## INTRODUCTION

Plaintiffs Agricola Cuyuma SA (hereinafter "Cuyuma") and Corporacion Agricola Vinasol SAC (hereinafter "Vinasol") were disappointed in the financial outcome of their respective 2016 pea-growing campaigns in coastal Peru. They had over-treated and otherwise mishandled a variety of pea seed with which they had no prior experience, without test-planting said seed, and the crop that resulted was insufficient to satisfy their promises to their respective customers. Seeking to cover the business losses which resulted from this combination of factors, both plaintiffs chose to, essentially, blame the seed, rather than take responsibility for poor business practices and acknowledge bad luck. As a result, the plaintiffs, erstwhile competitors, filed suit against the manufacturer of the seed, Crites Seed, Inc. (hereinafter "Crites") and the distributor with whom they entered into contracts to purchase the seed, Corona Seeds, Inc. (hereinafter "Corona"). The causes of action alleged against Crites sound only in tort (negligence and strict product liability); the causes of action alleged against Corona sound both in tort and in contract.

The evidence introduced at trial will demonstrate conclusively that (1) the seed in question was not a defective product, (2) the seed in question was not manufactured negligently, (3) there is no factual basis for plaintiffs' claim that the seed was somehow "contaminated" or "infected" when it left Crites' facility in Washington state, and (4) the damages plaintiffs allege they sustained as the result of their 2016 pea-growing campaign are illusory, at best. In addition, evidence introduced at trial will establish that no "special relationship" existed between Crites, on the one hand, and plaintiffs, on the other, which could operate to save plaintiffs' tort claims from application of the economic loss rule.

## II.

## <u>FACTUAL BACKGROUND</u>

The sugar snap pea[1] seeds at issue were grown and harvested at Crites' direction on fields in Washington State.  The fields in which they were grown were inspected by the Washington State Department of Agriculture in keeping with industry standards, and the plants from which the seeds were harvested were certified free of disease.  Each lot of a particular variety of seeds is identified by the field, or lot, in which it was grown; in this case, the seeds which are alleged to be defective are identified as Lot 242606 (hereinafter "606 seeds").  The 606 seeds were then milled and stored at Crites' facility in Quincy, Washington, preparatory to being packaged as requested by Crites' customers, nearly all of whom (including Corona) are independent distributors of seed, not commercial farmers like the plaintiffs.  There is no evidence whatsoever in this case that any of Crites' business practices in the growing, harvesting, milling, storing, treating, and/or packaging of seed fell below any applicable standard of care.  Plaintiffs' sole witness on the issue of Crites' allegedly negligent conduct, Dr. Michael Coffey, is expected to testify that he did no investigation whatsoever into Crites' business practices, and never visited Crites' facility.  Crites' employees are expected to testify that plaintiffs' complaints regarding the performance of the pea seeds at issue – a variety of sugar snap peas known as Sapphire peas -- were the only complaints about which they were informed regarding Sapphires.  In short, there will be no direct evidence introduced at trial of either (1) Crites' negligent production practices or (2) defects in the pea seeds attributable to said production.

Evidence introduced at trial will also establish the parameters of the relationships between the parties, to the detriment of plaintiffs' damage claims.  Specifically, the only contractual relationships at issue are those between plaintiffs, on the one hand, and

---

[1] Edible sugar snap peas are characterized by a "bumpy" appearance, as distinct from the flatter profile of a "snow pea." Plaintiffs planted both sugar snap peas and snowpeas in their leased fields during their respective 2016 campaigns.  The seeds manufactured by Crites which are at issue in this case were solely sugar snap peas of a single proprietary variety:  Sapphire.

Corona, on the other.  Crites never entered into any contract with either plaintiff, and, in fact, did not know that the seed it agreed to sell to Corona was destined for plaintiffs' farms in Peru.[2]  The 606 seeds Crites sold to Corona in February, March, and April of 2016, were not manufactured by Crites for any particular commercial farmer, let alone the plaintiffs in this case.  They were not manufactured to any individual commercial farmer's specification.  Crites never spoke with any representative of either Cuyuma or Vinasol at any point before, during, or after the plaintiffs' 2016 pea-growing campaign.  Cuyuma's and Vinasol's communications regarding the alleged defects in the 606 seeds were, at all times, with Corona and its representatives.  In short, there is/was no legally-cognizable "relationship" between Crites and either plaintiff.  As set forth in greater detail below, this lack of any contractual or extra-contractual relationship between Crites and the plaintiffs is crucially important to an analysis of the damages plaintiffs claim in this case.

The first of the 606 seeds purchased by plaintiffs made their way to plaintiffs' leased farmland in May (for Vinasol) and June (for Cuyuma).[3]  Between Quincy, Washington, and the plaintiffs' fields in Peru, the 606 seeds passed from (1) ocean/air carriers to (2) quarantine at a port facility in Lima, Peru, to (3) trucks owned and/or operated by plaintiffs, which drove the seeds to (4) the plaintiffs' production facilities where the bags were unloaded and stored, before being transported to (5) the fields leased by plaintiffs for the purpose of planting the seeds for harvest, where they were (6) subjected to the application of additional chemicals prior to planting.  Crites did not direct or control any of these phases.  The evidence introduced at trial will demonstrate that, while the 606 seeds were in quarantine in Lima, a period of two to three weeks, they

_____

[2] Crites knew that Corona had re-sold Crites-manufactured seed in Guatemala, but did not know that Corona intended to sell its Sapphires in Peru.  Guatemala is a Northern Hemisphere country; Peru is a Southern Hemisphere country.  Evidence introduced at trial will establish the necessity of ensuring that seeds are planted in conditions (soil, water, weather, etc.) which optimize their growth.

[3] Both plaintiffs planted snow peas in fields adjacent to the fields in which the sugar snap peas were planted, for purposes of their 2016 pea campaigns.  Crites did not manufacture the snow pea seeds.

were tested for pathogens (disease-causing microorganisms) and received a clean bill of health.

Once plaintiffs received the 606 seeds, they opted not to take the reasonable precaution of test-planting a sample of the seeds prior to larger-scale planting. Test-planting would have been a commercially-reasonable endeavor because: (1) Sapphire was a variety of pea unknown to both plaintiffs, and (2) Cuyuma, in particular, had never planted peas of any variety prior to the 2016 growing season.[4] Peru's winter planting season begins in June, and soil temperatures can make a very big difference in the performance of any individual variety of seed – evidence introduced at trial will establish that the 606 seeds may have required warm soil to perform correctly. Both plaintiffs are expected to testify at trial that they did not perform soil or water tests on the fields they leased from local farmers for their 2016 pea-growing campaign – instead they relied on their general sense that the fields had performed well in the past. The water used to irrigate the fields leased by plaintiffs came from either wells on the property (Cuyuma) or rivers (Vinasol), both of which are water sources prone to contamination. Both plaintiffs are also expected to testify at trial that they subjected the 606 seeds to treatment with fungicides shortly before planting them – notwithstanding the fact that the 606 seeds had already received a broad-spectrum anti-fungal treatment at Crites' facility in Quincy at the request of Corona.[5] Evidence introduced at trial is expected to establish that the viability of seeds (which are living organisms) can be adversely effected by improper treatment protocols such as those engaged in by the plaintiffs.[6]

---

[4] Cuyuma came into being at the end of 2014, and had had just one growing campaign prior to the 2016 pea-growing campaign. Specifically, Cuyuma had grown asparagus in 2015.

[5] Crites does not, as a general practice, treat its raw seeds except as requested by its customers. In this case, Corona requested treatment of the 606 seeds with a fungicide called "Thiram." Thiram is a commonly-used fungicide in the United States, which Crites has applied to Sapphires produced in various lots, and to seeds other than peas. There is no evidence that Crites misapplied Thiram to any of its seeds.

[6] Additional evidence will be introduced at trial regarding the *many* chemical treatments to which plaintiffs subjected their pea plants during the 2016 campaigns. These treatments included herbicides applied to the soil in which the pea seeds were planted, insecticides sprayed onto the crops at various points during their growth prior to harvest, growth hormones applied to the pea crops, and soil amendments added at or about the time of planting. Given that Sapphires were a brand-new pea

Shortly after planting the first bags of 606 seeds (Vinasol began planting in May, Cuyuma began planting in June), plaintiffs' field managers noted that the 606 seeds were not sprouting as expected.  Both plaintiffs notified Corona of the issue. In response, Corona (1) offered to send plaintiffs replacement seeds and (2) advised plaintiffs to plant the replacement seeds "heavy."  The latter recommendation essentially suggested that the plaintiffs should plant three seeds per hole, as opposed to one seed per hole.  Corona's representative also recommended that plaintiffs amend the soil in their fields to ensure an optimal environment for the pea seeds.  Plaintiffs took Corona up on its offer of replacement seeds; the replacement seeds which Corona provided were a mix of Sapphire seeds grown on different lots by Crites and non-Sapphire seeds from sources other than Crites.  Interestingly, while plaintiffs now claim that they knew that the 606 seeds were "infected" or "contaminated" within a matter of days following planting of the first bags, they did nothing to remove the allegedly contaminated 606 seeds from their fields prior to planting the replacement seeds in the same locations, in the same soil.

The replacement seeds – which plaintiffs do *not* claim are defective – did not grow as expected by plaintiffs, and their resultant pea harvests were smaller than they had anticipated as a result.  Specifically, plaintiffs claim that their harvests were too small to satisfy the contracts plaintiffs had entered into with their respective customers at the outset of the 2016 pea campaign – contracts in which Crites had no involvement and about which Crites had no prior knowledge.  This damage – all of which is purely economic loss defined by plaintiffs' expectations in the context of their contractual relationships – is at the heart of the claims asserted by both plaintiffs.  The plaintiffs did not receive the benefit of the bargains they struck; Crites was not a party to, and had no control over, any of those bargains.

As Crites understands it, plaintiffs also intend to argue that the 606 seeds somehow spread their "contamination" to adjacent plants, with a deleterious effect on harvests from

variety, never before grown in Peru, the introduction of these chemicals is expected to form the basis for defendants' argument that plaintiffs simply mistreated their pea crops to their own detriment.

those plants.  This argument is expected to be unsupported by any factual trial evidence.  Specifically, evidence introduced at trial will establish that the pathogen upon which plaintiffs base their entire "contamination" claim – an unknown species of a fungus-like microorganism called "Pythium" – is found in nearly all soils around the world, including the soils of Peru.  Pythium species are also commonly found in water sources.  There will be *no evidence* presented at trial establishing which of the hundreds of Pythium species was allegedly dragooned in Washington by the 606 seeds and allegedly transported over several months and 4,000 miles to plaintiffs' leased fields in Peru.  There will be *no evidence* presented at trial establishing that Pythium (usually found in either water or soil) is even capable of being carried by seed.  There will be *no evidence* presented at trial that the plants which did sprout from either the 606 seeds or the replacement seeds planted by plaintiffs exhibited the characteristics of Pythium damage.  In fact, Dr. Coffey, plaintiffs' expert liability witness, is expected to testify at trial (as he did during his deposition) that his review of photographs of the plant matter which emerged from the plaintiffs' pea fields did not reveal the "classic" signs of Pythium-related damping off.

Crites expects plaintiffs to submit two additional arguments in support of their causes of action for negligence and strict product liability:  (1) that the 606 seeds were simply too old to sell, and (2) that the 606 seeds exhibited a lower germination rate than the rate reflected on the labeled bags.   Neither argument is expected to withstand scrutiny at trial.  First, trial testimony will establish that there is no such thing as an accepted "shelf life" associated with any individual type of commercially-grown seed, let alone a shelf life associated with pea seeds.  At deposition, plaintiffs' liability expert could not identify any minimally-qualified evidence as a basis for his "expert" opinion in this regard, and we anticipate no such evidence will be introduced at trial.  To the contrary:  Crites will introduce evidence that seed is like any other living organism in that it is generally impossible to predict how long it will live.  Crites employees are also

expected to testify that the parent seed of 606 seeds (Lot S042500), which was originally grown in 2010, is currently being used to increase inventory stock without problems.

The issue of germination rates is nothing more than a red herring. First, there is no evidence whatsoever that plaintiffs demanded pea seeds reflecting a specific germination rate. Second, evidence introduced at trial will establish that the germination rates reflected in labels on bags of seed sold by Crites are not predictive; they are snapshots of a given seed sample's viability at a specific point in time. Germination rates are obtained by taking samples of raw seed, exposing them to moisture (by wrapping raw seed in wet toweling), and leaving them in an incubator for a set amount of time. At the end of that time, the seeds are removed and examined for signs that roots/shoots have begun to emerge from the seed. Crites' practice (consistent with federal law) was to test its stock of seeds every five months; the relevant germination test in this case (of inventory stock 606 seeds) took place in November 2015, at which point the sample tested reflected a germination rate of 87%. This is the data point which normally would be entered into the labels of *any* bags of 606 seed sold by Crites between November 2015 and April 2016. That is precisely what happened in this case, as the evidence introduced at trial will establish. There will be *no evidence* admitted at trial which calls into question the testing protocol used to obtain the November 2015 germination rate (the test was conducted by an independent facility). There will be *no evidence* admitted at trial which will permit the inference that any single germination rate is a guarantee of future germination. There *will* be a significant amount of evidence admitted at trial establishing the many ways a given seed can be mishandled (by application of too many/the wrong kind of chemicals, by introduction of the seed to a sub-optimal soil/water environment, by mechanical processes, etc.) which would result in crop volume which does not conform with a prior germination rate obtained from a sample.

Finally, the rate at which the 606 seeds, or any seeds for that matter, grew into a crop of plants suitable for harvest is irrelevant to the damages legally recoverable from

-7-

Crites, against which only claims sounding in tort are alleged. Crop volume is one of the benefits of the bargain plaintiffs struck with Corona. It is an element of contract damages which, as set forth below, is foreclosed to plaintiffs in their case against Crites.

### III.

### LEGAL ISSUE

**A.    The Economic Loss Rule**

Plaintiffs, aware that their relationship with Crites is both distant and non-contractual, alleged only *tort claims* against Crites: negligence and strict products liability. But, under the law of most United States jurisdictions including California, plaintiffs cannot recover for the economic damages occasioned by the failure of a product to perform as anticipated *via* product liability claims sounding purely in tort. The Ninth Circuit, in *Giles v. GMAC* (2007) 494 F.3d 865, 874, following a detailed discussion of the history behind this concept, stated the rule succinctly as follows:

> The economic loss doctrine in product liability cases can be easily stated. If a plaintiff is in a contractual relationship with the manufacturer of a product, the plaintiff can sue in contract for the normal panoply of contract damages, including foreseeable lost profits and other economic losses. Whether or not the plaintiff is in a contractual relationship with the manufacturer, the plaintiff can sue the manufacturer in tort only for damages resulting from physical injury to persons or to the property other than the product itself.

The California Supreme Court also summarized the history and rationale behind this rule – known as the economic loss rule – in *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 988 - 989. Per *Robinson*, economic loss consists of "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits – without any claim of personal injury or damages to other property." *Id.* at p. 988, citing *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 482. The economic loss rule provides: "[W]here a purchaser's expectations in a sale are

-8-

frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic losses.'" *Id.* at p. 988, citing *Neibarger v. Universal Cooperatives, Inc.* (1992) 439 Mich. 512 [486 N.W.2d 612, 615]. The doctrine "hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts." *Ibid.*

The United States District Court for the Southern District of California applied these principles outlined in *Robinson* and *Jimenez* in a case involving facts similar to those at issue herein.  In *Agricola Baja Best v. Harris Moran Seed Co.* (2014) 44 F.Supp.3d 974, 979, a tomato grower purchased seeds manufactured by defendant Harris Moran through a distributor located in Mexico.  A representative of the distributor recommended a specific type of tomato seed based on its alleged resistance to a particular disease.  *Id.*  After the seed was planted, having first been subjected to a treatment not previously-approved by Harris Moran, the seed showed signs of the disease in question. *Id.* at pp. 980 – 981.  Plaintiff sued Harris Moran on both contract and tort theories of liability, and Harris Moran moved for summary judgment.[7]

The District Court granted Harris Moran's motion on plaintiff's products liability claims, relying primarily on the economic loss rule.  *Id.* at pp. 987 – 988.  The Court stated:  "Under the economic loss rule, 'a purchaser must recover in contract for purely economic loss due to disappointed expectations.'  [Citation omitted.]  'Economic loss consists of damages for inadequate value, costs of repair, and replacement of the defective product or consequent loss of profits – without any claim of . . . damage[] to other property.'  [Citation omitted.]  Tort recovery is available if the defective product

---

[7] In response to Harris Moran's motion on the contract claims, plaintiff argued that (1) Harris Moran was the true seller of the tomato seeds at issue, and (2) the distributor in question was Harris Moran's agent.  *Id.* at p. 982 – 983.  The court dismissed the former argument out of hand, noting the distinct corporate existence of both businesses (see, p. 982, fn. 3), and determined that an issue of fact existed with respect to plaintiff's agency argument (see, p. 983).

-9-

damages 'property other than the defective product itself.' [Citation omitted.]" *Id.* at p. 987.

The same outcome should obtain with respect to plaintiffs' claims against Crites. That no contract existed between Crites and either of the plaintiffs is indisputable. Evidence introduced at trial will establish that Crites had no idea to whom Corona intended to sell its 606 seeds – and, in fact, had no idea the 606 seeds would be planted in Peru.  Without a contract, plaintiffs cannot recover damages for their economic losses against Crites – those losses are contract damages, and plaintiffs' remedies are, if available at all, only available as against the party with whom they negotiated their contracts, Corona.  To the extent plaintiffs can prove at trial that, somehow, the 606 seeds "infected" adjacent fields in which *they were not planted*, they are limited in their recovery to those damages traceable to said "infection."  Crites is confident that no such proof exists.

Plaintiffs' cases, cited in their Trial Brief, do not assist them.  In support of their argument that the economic loss rule only applies when there is a contract between the parties, plaintiffs cite to three apparently unreported, non-binding rulings on motions (*UMG Recordings*, *Gauba v. Florence Hosp.*, Ltd. Liab. Co., 2013 U.S. Dist. LEXIS 86215 at *8, and *Wells v. Chase Home Fin. LLC*, 2010 U.S. Dist. LEXIS 127854 at *17), only one of which could be located in a Westlaw search.   The ruling which could be located (*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 2015 WL 12746208), is one of a string of eleven in which the United States District Court for the Central District of California considered and re-considered the sufficiency of the parties' pleadings in a non-product liability matter in the face of repeated motions to dismiss and repeated responsive amendments to the operative pleadings; it is neither binding nor factually compelling precedent.  The sole remaining reported case cited by plaintiffs on the applicability of the economic loss rule is similarly unhelpful.  *Affiliated FM Ins. Co. v. LTK Consulting Servs.* (9th Cir. 2009) 556 F.3d 920, is another non-product liability case, in which the

court declined to rule on the issue of the applicability of the economic loss rule, and instead certified an underlying question of law (though not the issue of whether or not the economic loss rule would ultimately apply) to the Washington State Supreme Court. *Id.* at pp. 922 – 923. Plaintiffs also cite to a California Supreme Court case in which the economic loss rule *was* applied to prevent plaintiffs from recovering for purely economic injury (lost income) *via* tort claims: *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 394 – 395. In short, there is no legal support for plaintiffs' contention that Crites cannot assert the economic loss rule because it had no contractual relationship with either plaintiff.

Plaintiffs also attempt to argue that there exists between themselves and Crites a "special relationship" which provides them with an exception to the economic loss rule, should the rule apply. They state: "Plaintiffs were the intended beneficiaries of Crites contract with Corona . . . [because] the Seeds were intended to be sold to commercial growers of sugar snap peas, such as Plaintiffs." (Trial Brief, p. 2, lines 21 – 26.) Plaintiffs cite to no case law whatsoever in support of their proposition that, essentially, each and every manufacturer of a product has a "special relationship" with each and every ultimate user of that product, regardless of whether or not the ultimate users of the product are known to the manufacturers at or before the point of sale. In *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 802 – 803, cited by plaintiffs in support of their preposterously expansive concept of "special relationships," the parties were, in fact, aware of each other's existence during, and had communicated about, the activity which was alleged to underlie the plaintiff's damage was on-going. There will be no comparable evidence offered at trial regarding Crites' pre-existing knowledge of, or communication with, plaintiffs.

In *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, also cited by plaintiffs in support of their "special relationship" argument, the Supreme Court of California applied the economic loss rule to deny claims for purely economic losses

-11-

suffered by businesses who sued Southern California Gas Company solely in tort.  *Id.* at pp. 394 – 395.  The case is factually inapposite, given that it does not consider at all the question of whether the manufacturer of a product can be found to have a "special relationship" with an ultimate user of the product, for purposes of imposing a duty of care on the manufacturer to protect that ultimate user from economic loss.  Instead, the court found that the gas company in question did not owe a duty of care to parties impacted by its gas leak, *but with which it had not contracted*, to protect them from economic losses resulting from its conduct.  *Ibid.*  In response to plaintiffs' argument that a "special relationship" exception should apply, the Supreme Court embarked on a detailed examination of the circumstances under which such a relationship could arise, noting that it would typically arise when "the plaintiff was an intended beneficiary *of a particular transaction*."  *Id.* at p. 400, emphasis added.  The Supreme Court took great pains to foreclose the kind of wholesale "every relationship is special" reasoning plaintiffs attempt herein, noting that "[d]eciding whether to impose a duty of care turns on a careful consideration of the 'sum total' of the policy considerations at play."  *Id.* at p. 401.  The Supreme Court also rejected foreseeability as sufficient in and of itself to establish a "special relationship:"  "In requiring more than mere foreseeability for imposing a duty of care . . . we appreciate[] the need to safeguard the efficacy of tort law by setting meaningful limits on liability."  *Ibid.*  Finally, the Supreme Court stated:

> [A]lthough exposure to liability often provides an important incentive for parties to internalize the social costs of their actions, we were concerned that allowing countless people . . . to recover 'pure economic loss suffered . . . would 'raise[] the spectre of vast numbers of suits and limitless financial exposure.  [Citation omitted.]  The resulting universe of potential claims would not only raise difficult line-drawing questions for courts, it might deter socially beneficial behavior.

*Id.* at pp. 401 – 402.

In short, plaintiffs have cited the Court to no binding case law which supports their stated position on the inapplicability of the economic loss rule to Crites.  They will be unable to offer evidence at trial establishing the existence of a "special relationship" between themselves and Crites.  The economic loss rule thus limits their recovery against Crites to those damages they can prove flowed solely from the alleged "infection" of adjacent fields by the 606 seeds.  Crites is confident no such proof exists.

**B.    Plaintiffs' Comparative Fault**

Crites is entitled to present evidence and argument establishing the role played by plaintiffs' own negligent conduct in the damages they claim to have sustained as the result of their failed 2016 agricultural campaigns.  *Daly v. General Motors Corporation* (1978) 20 Cal.3d 725, 737.  In this regard, we anticipate the introduction of evidence at trial which will establish that plaintiffs (1) failed to ensure that the soil and water which would provide the growth medium for the peas they intended to grow in 2016 were appropriate for pea seeds, (2) failed to ensure that the Sapphire variety of seeds could be grown successfully in Southern Hemisphere soils during the winter, (3) failed to perform a test-planting of the Sapphire seeds prior to wider-scale sowing, (4) repeated the foregoing failures when they opted to plant replacement seeds in the same soils alongside the 606 seeds, (5) over-treated the 606 seeds with unnecessary and potentially deleterious chemicals, including fungicides, herbicides, and insecticides, and (6) failed to treat the resultant plants (both from 606 seeds and replacement seeds) with the level of care expected of reasonable commercial growers during harvest and shipping of the product.  To the extent a jury finds this evidence compelling, plaintiffs' comparative fault must apply to reduce their recovery.

## IV.

## CONCLUSION

Crites looks forward to addressing the issues outlined above during trial of the captioned matter.

Dated: June 11, 2021

GORDON REES SCULLY MANSUKHANI, LLP


By:   */s/ Lisa G. Taylor*
_____

Jason F. Meyer
J. Todd Konold
Lisa G. Taylor
Attorneys for Defendant,

CRITES SEED, INC.

## CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is: Gordon Rees Scully Mansukhani, LLP, 101 W. Broadway, Suite 2000, San Diego, CA  92101, my electronic mail address is crogers@grsm.com.  On June 11, 2021, I served the foregoing document(s) as follows:

### DEFENDANT CRITES SEED, INC'S TRIAL BRIEF

☒    BY ELECTRONIC SERVICE THROUGH THE CM/ECF SYSTEM which automatically generates a Notice of Electronic Filing at the time said document is filed to all CM/ECF Users who have appeared in this case.  Service with this NEF constitutes service pursuant to FRCP 5(b)(E).

| | |
|---|---|
| Brian Nomi, Esq.<br>Law Office of Brian Nomi<br>215 E. Daily Drive, Suite 28<br>Camarillo, CA 93010<br>Phone: (805) 444-5960<br>Fax: (805) 357-5333<br>Email: briannomi@yahoo.com | Co-Counsel for Plaintiffs Agricola Cuyuma SA and Corporacion Agricola Vinasol S.A.C. |
| Eduardo Ayala Maura, Esq.<br>Ayala Law P.A.<br>1390 Brickell Avenue, Suite 335<br>Miami, FL 33131<br>Phone: (305) 570-2208<br>Fax: (305) 305-7206<br>Email: eayala@ayalalawpa.com | Co-Counsel for Plaintiffs Agricola Cuyuma SA and Corporacion Agricola Vinasol S.A.C. |
| Cheryl A. Kirkpatrick, Esq.<br>Fang-Chung Li, Esq.<br>Horton, Oberrecht & Kirkpatrick<br>3 Park Plaza, Suite 350<br>Irvine, CA 92614<br>PH:  (949) 251-5100<br>FX:  (949) 251-5104<br>Email: ckirkpatrick@hortonfirm.com<br>fli@hortonfirm.com | Co-Counsel for Defendant Corona Seeds, Inc. |
| Bruce Alan Finck, Esq.<br>Wood & Finck<br>3295 Telegraph Rd., 1st Fl.<br>Ventura, CA 93003<br>Phone: (805) 642-0060<br>Fax: (805) 642-0090<br>Email: bfinck@woodfinck.com | Counsel for Defendant Corona Seeds, Inc. |

CERTIFICATE OF SERVICE                                          CASE NO. 2:17-cv-8220-DMG (SKx)

1         I declare under penalty of perjury under the laws of the United States of America

2   that I am employed in the office of a member of the Bar of this Court at whose direction

3   the service was made.

4         Executed on June 11, 2021 at San Diego, California.

5

6                              */s/ Coral M. Rogers*
                           Coral M. Rogers

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28